1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:04 CV 676-M

2

3

ORIGINAL

4

5

6    DECLAN J. MCAULEY                          PLAINTIFF

7

8    VS.                    **DEPOSITION FOR DEFENDANT**

9

10   R & L TRANSFER, INC.                       DEFENDANT

11

12

13                     *** *** ***

14   DEPONENT:    DAVID G. CHANGARIS, M.D.

15   DATE:        JULY 25, 2006

16                     *** *** ***

17

18

19

20   ERIC J. SOERGEL
     REPORTER

21   _____

22            HANDY, CHUPPE & SOERGEL LLC
            COURT REPORTERS AND VIDEO SERVICE
23               1469 SOUTH FOURTH STREET
             LOUISVILLE, KENTUCKY  40208
               (502) 637-8500   (800) 330-4098
24    FAX: (502) 637-8777   EMAIL:INFO@KYDEPO.NET
                 WEB: KYDEPO.NET
25

**EXAMINATION
INDEX**

|  | EXAMINATION | CONTINUING EXAMINATION |
|---|---|---|
| BY MS. LOUCKS: | 4-59 | 61-62 |
| BY MR. MUSSLER: | 59-61 | |

**EXHIBIT
INDEX**

EXHIBIT 1 -   CURRICULUM VITAE                    PAGE 4

EXHIBIT 2 -   MEDICAL FILE                        PAGE 28
              (REPORTER'S NOTE: EXHIBIT
              RETAINED BY WITNESS)

1    THE DEPOSITION OF DAVID G. CHANGARIS, M.D., TAKEN

2    ON DISCOVERY, PURSUANT TO NOTICE HERETOFORE FILED, IN

3    THE OFFICES OF DAVID G. CHANGARIS, M.D., 801 BAXTER

4    AVENUE, SUITE 103, LOUISVILLE, JEFFERSON COUNTY,

5    KENTUCKY, ON JULY 25, 2006, AT APPROXIMATELY 5:00 P.M.,

6    UPON ORAL EXAMINATION, AND TO BE USED IN ACCORDANCE

7    WITH THE FEDERAL RULES OF CIVIL PROCEDURE.

8

9                     ***   ***   ***

10                A P P E A R A N C E S

11   FOR THE PLAINTIFF:        THEODORE L. MUSSLER, JR., ESQ.
                               MUSSLER & ASSOCIATES
12                             401 WEST MAIN STREET
                               SUITE 1700
13                             LOUISVILLE, KENTUCKY 40202

14   FOR THE DEFENDANT:        NANCY B. LOUCKS, ESQ.
                               FROST BROWN TODD
15                             400 WEST MARKET STREET
                               32ND FLOOR
16                             LOUISVILLE, KENTUCKY 40202

17

18                     ***   ***   ***

19

20

21

22

23

24

25

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

---

**Page 1**

[1]                  UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF KENTUCKY
[2]                       LOUISVILLE DIVISION
                   CIVIL ACTION NO. 3:04 CV 676-M
[3]
[4]
[5]
[6]     DECLAN J. MCAULEY                        PLAINTIFF
[7]
[8]     VS.            DEPOSITION FOR DEFENDANT
[9]
[10]    R & L TRANSFER, INC.                     DEFENDANT
[11]
[12]
[13]                     ***  ***  ***
[14]    DEPONENT:    DAVID G. CHANGARIS, M.D.
[15]    DATE:          JULY 25, 2006
[16]                     ***  ***  ***
[17]
[18]
[19]
[20]    ERIC J. SOERGEL
        REPORTER
[21]    _____
                HANDY, CHUPPE & SOERGEL LLC
[22]        COURT REPORTERS AND VIDEO SERVICE
                  1469 SOUTH FOURTH STREET
[23]          LOUISVILLE, KENTUCKY  40208
                (502) 637-8500  (800) 330-4098
[24]     FAX: (502) 637-8777  EMAIL:INFO@KYDEPO.NET
                     WEB: KYDEPO.NET
[25]

---

**Page 2**

[1]                     EXAMINATION
                          INDEX
[2]
                                        CONTINUING
[3]                     EXAMINATION      EXAMINATION
[4]     BY MS. LOUCKS:        4-59         61-62
[5]     BY MR. MUSSLER:      59-61
[6]
[7]
[8]
[9]                       EXHIBIT
                           INDEX
[10]
        EXHIBIT 1 -  CURRICULUM VITAE          PAGE 4
[11]
        EXHIBIT 2 -  MEDICAL FILE              PAGE 28
[12]                  (REPORTER'S NOTE: EXHIBIT
                      RETAINED BY WITNESS)
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 3**

[1]          THE DEPOSITION OF DAVID G. CHANGARIS, M.D., TAKEN
[2]     ON DISCOVERY, PURSUANT TO NOTICE HERETOFORE FILED, IN
[3]     THE OFFICES OF DAVID G. CHANGARIS, M.D., 801 BAXTER
[4]     AVENUE, SUITE 103, LOUISVILLE, JEFFERSON COUNTY,
[5]     KENTUCKY, ON JULY 25, 2006, AT APPROXIMATELY 5:00 P.M.,
[6]     UPON ORAL EXAMINATION, AND TO BE USED IN ACCORDANCE
[7]     WITH THE FEDERAL RULES OF CIVIL PROCEDURE.
[8]
[9]                    ***  ***  ***
[10]             A P P E A R A N C E S
[11]    FOR THE PLAINTIFF:     THEODORE L. MUSSLER, JR., ESQ.
                              MUSSLER & ASSOCIATES
[12]                          401 WEST MAIN STREET
                              SUITE 1700
[13]                          LOUISVILLE, KENTUCKY 40202
[14]    FOR THE DEFENDANT:     NANCY B. LOUCKS, ESQ.
[15]                          FROST BROWN TODD
                              400 WEST MARKET STREET
[16]                          32ND FLOOR
[17]                          LOUISVILLE, KENTUCKY 40202
[18]                    ***  ***  ***
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 4**

[1]          DAVID G. CHANGARIS, M.D., CALLED ON BEHALF OF THE
[2]     DEFENDANT, AFTER HAVING FIRST DULY AFFIRMED, WAS
[3]     EXAMINED AND TESTIFIED AS FOLLOWS:
[4]
[5]                        EXAMINATION
[6]
[7]     BY MS. LOUCKS:
[8]        Q.    GOOD AFTERNOON, DR. CHANGARIS.  MY NAME IS
[9]     NANCY LOUCKS, AND I AM AN ATTORNEY REPRESENTING R & L
[10]    TRANSFER, INCORPORATED IN A LAWSUIT BROUGHT BY
[11]    MR. DECLAN MCAULEY REGARDING AN ACCIDENT THAT OCCURRED
[12]    ON SEPTEMBER 23, 2003.  COULD YOU PLEASE STATE YOUR
[13]    FULL NAME FOR THE RECORD.
[14]       A.    DAVID G. CHANGARIS.
[15]       Q.    AND WHAT KIND OF DOCTOR ARE YOU?
[16]       A.    A NEUROLOGICAL SURGEON AND PAIN MEDICINE
[17]    PHYSICIAN.  COULD I ASK -- WOULD YOU LIKE A C.V.?
[18]       Q.    THAT WOULD BE LOVELY.  THANK YOU.
[19]       A.    JUST A SECOND.
[20]         REPORTER'S NOTE: WHEREUPON A BRIEF RECESS WAS
[21]    TAKEN AND THE FOLLOWING WAS HEARD:
[22]        (WHEREUPON DEPOSITION EXHIBIT 1 WAS DULY RECEIVED
[23]    AND MARKED FOR IDENTIFICATION)
[24]
[25]    BY MS. LOUCKS:

---

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

[1]     Q.    YOU SAY YOU ARE A NEUROLOGICAL SURGEON AND
[2]  PAIN MANAGEMENT SPECIALIST?
[3]     A.    YES.
[4]     Q.    AND ARE YOU BOARD CERTIFIED IN THESE
[5]  SPECIALTIES?
[6]     A.    YES.
[7]     Q.    AND DO YOU CURRENTLY DO SURGERY?
[8]     A.    NO.
[9]     Q.    AND WHY IS THAT?
[10]    A.    WELL, I DEVELOPED DYSTONIA IN 1997.  IT'S
[11] SORT OF LIKE PARKINSON'S DISEASE.  SO I JUST DECIDED TO
[12] DO THE OFFICE-BASED ASPECT OF NEUROLOGICAL SURGERY.
[13]    Q.    AND YOU SAY YOU ARE A PAIN SPECIALIST.
[14] DOES THAT MEAN THAT YOU ARE AN ANESTHESIOLOGIST WITH A
[15] SUBSPECIALTY OF PAIN MANAGEMENT, OR IS THAT SOMETHING
[16] DIFFERENT?
[17]    A.    THE WORLD CHANGES SO QUICKLY.  PRIOR TO
[18] ABOUT, I THINK MAYBE; 1990 ANESTHESIOLOGY DID NOT DO ANY
[19] PAIN MEDICINE; ALL PAIN MEDICINE WAS DONE BY
[20] NEUROSURGEONS, BASICALLY.  IT'S ONLY BEEN IN THE LAST
[21] 10 YEARS THAT ANESTHESIOLOGISTS HAVE GOTTEN INTO THE
[22] PAIN MANAGEMENT BUSINESS WITH THEIR PARTICULAR BRAND OF
[23] INTERVENTIONAL APPROACH.  RIGHT NOW THEY ARE PROBABLY,
[24] DOLLAR-WISE, THE LARGEST MARKET SHARE OF THE PAIN
[25] BUSINESS.  THEY'VE CREATED THE PAIN BUSINESS.  THIS IS

[1]  AS IT IS TODAY.
[2]         PAIN MANAGEMENT, FROM A NEUROSURGICAL
[3]  PERSPECTIVE, REALLY HASN'T CHANGED THAT MUCH.  IT'S
[4]  ALWAYS COMPRISED, PROBABLY, OF 30, 40 PERCENT OF WHAT A
[5]  NEUROSURGEON DOES.  SO EVEN TODAY MOST NEUROSURGEONS
[6]  STILL DO THINGS THAT WOULD PROBABLY FALL UNDER THE
[7]  MANAGEMENT OF PAIN AS A PRACTICE.
[8]         MOST OF MY PRIOR WORK HAS BEEN IN TRAUMA, AND I
[9]  HAVE PUBLISHED IN HEAD INJURY EXTENSIVELY, HAD A
[10] NATIONAL INSTITUTES OF HEALTH CLINICAL INVESTIGATIVE
[11] DEVELOPMENT AWARD.  THEY GIVE ONE OF THOSE A YEAR TO A
[12] NEUROSURGEON WHO DID LOTS OF WORK.
[13]        BUT MY RESEARCH ACTUALLY WAS PUBLISHED BACK IN
[14] 1985, '86.  IT'S THE CURRENT WORLD STANDARDS FOR THE
[15] TREATMENT OF INTRACRANIAL HYPERTENSION.  IF YOU GO
[16] ONLINE AND TYPE MY NAME IN, YOU'LL GET LOTS OF HITS FOR
[17] HEAD INJURY AND TRAUMA AND THINGS LIKE THAT.
[18]        AND I LOVE PITUITARY PHYSIOLOGY.  I'VE PUBLISHED
[19] IN PITUITARY PHYSIOLOGY AND AM WELL PUBLISHED IN
[20] NEUROENDOCRINOLOGY, THE PERSON WHO SET A CHEMICAL MAP
[21] FOR CERTAIN PEPTIDES IN THE BRAIN WAY BACK WHEN.
[22]        SO I'VE LOOKED AT -- THE NEUROENDOCRINE BRAIN HAS
[23] BEEN A SPECIALTY INTEREST OF MINE FOR MOST OF MY LIFE,
[24] ESPECIALLY AS IT RELATES TO TRAUMA, AND THAT'S PRETTY
[25] MUCH HOW I SORT OF VIEW THESE PATIENTS FROM AN ACADEMIC

[1]  PERSPECTIVE.
[2]         FROM A PRACTICAL PERSPECTIVE, PEOPLE HURT AND I
[3]  TRY TO FIX THEIR PAIN.  BUT PEOPLE, LIKE IN THIS CASE,
[4]  DECLAN, SHOW UP AND THEY HAVE ABNORMAL PROBLEMS WITH
[5]  THEIR PITUITARY.  USUALLY FOR ONE REASON OR ANOTHER I'M
[6]  ONE OF THE FIRST PEOPLE TO SORT OF FOCUS THE LIGHT ON
[7]  IT, AND IT'S PROBABLY BECAUSE OF MY BACKGROUND.
[8]     Q.    NOW, ARE YOU THE DOCTOR WHO ACTUALLY
[9]  DIAGNOSED MR. MCAULEY WITH PITUITARY MALFUNCTION?
[10]    A.    I'M THE ONE THAT PROBABLY SUSPECTED IT
[11] FIRST.  I'M NOT SURE THAT -- THE ONE THING I'VE LEARNED
[12] IN ACADEMICS IS THAT WHEN YOU SAY YOU'RE THE FIRST,
[13] YOU'RE NEVER THE FIRST.  SOMEBODY ELSE HAS ALWAYS BEAT
[14] YOU TO THE PUNCH.  SOMEWHERE SOMEBODY HAS HAD A THOUGHT
[15] AND SCRIBBLED IT.  IT'S VERY HARD TO ALWAYS BE THE
[16] FIRST.  I DON'T WANT TO SAY THAT I'M THE FIRST, BUT I
[17] AM THE ONE WHO REFERRED THIS PATIENT TO DR. CYRUS.
[18]    Q.    NOW, HOW DID YOU PICK DR. CYRUS?  IS THAT
[19] SOMEBODY YOU KNEW AND YOU WORKED WITH BEFORE?
[20]    A.    YES.  I MEAN, HE'S -- NOT EVERYONE HAS A
[21] SKILL SET TO DEAL WITH NEUROTRAUMA AND BE OPEN TO THAT
[22] IN DEALING WITH THE NEUROENDOCRINE SIDE OF THE TRAUMA.
[23] AND HE IS ONE WHO IS, AND I LIKE HIM.  SO WE TALK.
[24]    Q.    WHEN YOU SENT MR. MCAULEY TO DR. CYRUS, DID
[25] YOU SEND ALL THE RECORDS AS WELL OR JUST MR. MCAULEY?

[1]    A.    WELL, YOU KNOW, THERE WASN'T MUCH RECORDS
[2]  AT THAT POINT.  IT WAS MORE LIKE I HAD A PHYSICAL
[3]  ENCOUNTER WITH MR. MCAULEY, AND THAT'S WHAT MY OPINION
[4]  WAS AFTER THE ENCOUNTER.
[5]  SO AT THAT POINT YOU ARE FACED WITH TWO THINGS:
[6]  EITHER YOU CAN TREAT IT EMPIRICALLY AND SEE IF THE
[7]  PERSON GETS BETTER, OR YOU CAN DO A WHOLE BUNCH OF LAB
[8]  TESTS TO DOCUMENT IT AND THEN MOVE FORWARD BASED UPON
[9]  THE LAB TESTS.
[10]       DR. CYRUS IS A BLEND OF A PRACTICAL AND
[11] ACADEMICIAN THAT I ENJOY.  I SEND PATIENTS THAT CAN'T
[12] AFFORD -- HE'LL DO WHAT I CALL ADEQUATE TESTING FOR
[13] DOCUMENTATION TO MOVE FORWARD IN TREATMENT; WHEREAS, IF
[14] YOU GO TO AN ACADEMIC PROGRAM, THEY MAY WANT TO DO A
[15] MILLION-DOLLAR WORKUP AS OPPOSED TO A TEN-THOUSAND-
[16] DOLLAR WORKUP.  SOME PEOPLE CAN'T AFFORD A MILLION-
[17] DOLLAR WORKUP, AND THEY CAN'T GET ACCESS TO TREATMENT
[18] BECAUSE OF THAT.
[19]    Q.    DID YOU HAVE MR. MCAULEY'S PREVIOUS MEDICAL
[20] TREATMENT RECORDS TO REVIEW THAT YOU PASSED ALONG TO
[21] DR. CYRUS?
[22]    A.    PROBABLY NOT.  I'VE BECOME AWARE THAT HE
[23] HAD BEEN INVOLVED IN OTHER ACCIDENTS AND A LOT OF HIS
[24] PRIOR MEDICAL PROBLEMS -- AS THIS, IF YOU WILL,
[25] ACTIVITY THAT YOU'RE ENGAGED IN HAS SINCE PROGRESSED.

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

Page 9

[1]     Q.    SO YOU DIDN'T HAVE ANY RECORDS TO REVIEW;
[2] YOU JUST EVALUATED HIM?
[3]     A.    BASICALLY, AND THE HISTORY.
[4]     Q.    WHAT HE TOLD YOU?
[5]     A.    YES.  HE JUST FIT THE PARADIGM OF PITUITARY
[6] INSUFFICIENCY -- TRAUMATIC PITUITARY INSUFFICIENCY THAT
[7] I HAVE COME TO UNDERSTAND.
[8]     Q.    NOW, IN YOUR PRACTICE -- I KNOW YOU SAID
[9] YOU DON'T DO SURGERY ANYMORE -- DO YOU DO TREATMENT OR
[10] JUST THIS FORENSIC, LITIGATION-TYPE WORK?
[11]    A.    90 PERCENT OF MY INCOME COMES FROM TREATING
[12] PATIENTS WHO HURT AFTER ACCIDENTS.  WE REDUCE THEIR
[13] PAIN.  WE HAVE PHYSICAL THERAPIES AND SOME
[14] INTERVENTIONS, INJECTIONS AND THINGS LIKE THIS, THAT
[15] ARE MINOR.
[16]    I TEND TO STAY AWAY FROM PERMANENT IMPLANTS AND
[17] THINGS LIKE THIS FOR PERSONAL REASONS.  IF PEOPLE NEED
[18] SURGERY, I REFER THEM TO MY SURGICAL COLLEAGUES WHO ARE
[19] ACTIVELY CUTTING.  BY AND LARGE, PEOPLE SEEM TO DO
[20] WELL, AS WELL AS ANYBODY.
[21]    Q.    NOW, OF THOSE 90 PERCENT, ARE THEY ALL IN
[22] LITIGATION, OR ARE ONLY SOME OF THEM IN LITIGATION?
[23]    A.    THEY WALK IN THROUGH THE DOOR AFTER THEY
[24] HAVE BEEN IN VARIOUS ACCIDENTS.  YOU KNOW, I'VE
[25] BASICALLY BEEN IN TRAUMA ALL MY LIFE.  WHEN I WAS BACK

Page 10

[1] AT THE UNIVERSITY, PROBABLY 80 TO 90 PERCENT OF MY
[2] SURGERIES WERE INVOLVED IN WHAT WE WOULD AFFECTIONALLY
[3] CALL THE KNIFE AND GUN CLUB, ROOM NINE AND THE LIKE.
[4]     IN MY TRAINING PROGRAM WE HANDLED HEAD INJURIES
[5] AT THE UNIVERSITY OF SOUTH CAROLINA, AND WE WERE ONE OF
[6] FOUR NATIONAL CENTERS FOR SPINAL CORD INJURY.  SO WE
[7] HANDLED THE WHOLE SOUTHEAST QUADRANT OF BROKEN NECKS
[8] AND BACKS.  SO I SAW THREE OR FOUR BROKEN NECKS A WEEK.
[9]     Q.    RIGHT NOW WHAT YOU ARE DOING, IS IT MOSTLY
[10] FOR PEOPLE IN LITIGATION, OR IS IT MOSTLY FOR PEOPLE
[11] THAT AREN'T IN LITIGATION?
[12]    A.    WELL, THE LITIGATION IS INCIDENTAL.  I
[13] TREAT THEIR PAIN.  I DON'T KNOW WHAT -- I MEAN, THERE'S
[14] OFTENTIMES MOTOR VEHICLE INSURANCE.  A CERTAIN
[15] PERCENTAGE OF THEM DON'T HAVE MOTOR VEHICLE INSURANCE,
[16] AND THEY'LL HAVE TO USE THEIR PRIMARY INSURANCE, HEALTH
[17] INSURANCE OR SOMETHING LIKE THIS, BUT PROBABLY -- IT'S
[18] HARD TO SAY EXACTLY WHAT PERCENTAGE ARE INVOLVED IN
[19] LITIGATION, BECAUSE IT'S A CAR ACCIDENT.
[20]    Q.    SURE.
[21]    A.    IT'S SOMEBODY THAT SLIPPED AND SOMEBODY
[22] HURT THEMSELVES.  MY GUESS IS, IT'S PROBABLY FIVE OR
[23] TEN PERCENT THAT ACTUALLY ACTIVELY END UP IN
[24] LITIGATION.  MY TOTAL AMOUNT OF TIME THAT I SPEND IN
[25] COURT IS A VERY, VERY SMALL PERCENTAGE OF MY TOTAL

Page 11

[1] PRACTICE.
[2]     THE LAST TIME I LOOKED, IN TERMS OF INCOME AND
[3] HOURS -- TOTAL INCOME TO THE PRACTICE, IT WAS LESS
[4] THAN -- ALL LITIGATION ACTIVITIES, ALL COURT WORK, ALL
[5] INDEPENDENT MEDICAL EXAMS, EVERYTHING PUT TOGETHER, IT
[6] WAS LESS THAN 10 PERCENT OF MY OVERALL PRACTICE.
[7]     Q.    ABOUT HOW OFTEN DO YOU TESTIFY IN
[8] DEPOSITIONS?
[9]     A.    I PROBABLY AVERAGE ONCE A MONTH, SOMEWHERE
[10] BETWEEN ONCE AND TWICE A MONTH.
[11]    Q.    AND ABOUT HOW MANY TIMES DO YOU GET TO
[12] TRIAL?
[13]    A.    TRIAL, MAYBE THREE OR FOUR TIMES A YEAR,
[14] MAYBE.
[15]    Q.    HAVE YOU EVER TESTIFIED IN AN AREA OTHER
[16] THAN NEUROLOGY?
[17]    A.    YOU MEAN NEUROSURGERY?
[18]    Q.    NEUROSURGERY, YES.
[19]    A.    I'M TRYING TO THINK.  YOU KNOW, MOST OF THE
[20] TIME THAT I HAVE TESTIFIED HAS BEEN AS A TREATING
[21] PHYSICIAN.  ON OCCASION THERE HAVE PROBABLY BEEN TWO OR
[22] THREE TIMES WHERE I'VE TESTIFIED AS STRICTLY AN
[23] INDEPENDENT MEDICAL EVAL.  IT'S RELATIVELY RARE THAT I
[24] DO THAT.
[25]    Q.    DO YOU EVER TESTIFY ON BEHALF OF THE

Page 12

[1] DEFENSE?
[2]     A.    I'VE NEVER GONE TO COURT FOR THE DEFENSE,
[3] BUT I DO I.M.E.'S FOR THE DEFENSE, IF YOU WILL.  THAT
[4] PROBABLY CONSTITUTES MAYBE 10, 20 PERCENT OF MY I.M.E.
[5] BUSINESS.
[6]     Q.    AND HOW MANY TIMES HAVE YOU WORKED WITH
[7] MR. MUSSLER BEFORE?
[8]     A.    I WISH -- I'M GOING TO HAVE TO START
[9] KEEPING TRACK OF THAT.  THE LAST TIME I TALLIED THAT UP
[10] I SAID IT WAS LESS THAN A HUNDRED, AND HE NEARLY HIT
[11] THE ROOF.  IT'S FAR LESS THAN A HUNDRED; PROBABLY 10,
[12] 20 TIMES AT MOST.
[13]    THAT'S OVER -- I'VE BEEN IN LOUISVILLE SINCE
[14] 1984, AND I'M JUST ASSUMING THAT JUST BY THE FACT THAT
[15] I HAVE BEEN IN THIS BUSINESS THAT HE HAS REPRESENTED
[16] PEOPLE THAT HAVE PASSED THROUGH MY OFFICE THAT I'M NOT
[17] EVEN CONSCIOUS OF, AND HE MAY NOT EVEN BE AWARE OF,
[18] BECAUSE I'VE TREATED PEOPLE THAT -- THAT HAVE GONE
[19] THROUGH.
[20]    Q.    LET ME ASK YOU THIS.  ABOUT HOW MANY TIMES
[21] HAVE YOU MET WITH MR. MCAULEY?  I KNOW HE WAS HERE FOR
[22] A FEW MINUTES BEFORE WE CAME IN.  HOW MANY TIMES HAVE
[23] YOU SEEN HIM?
[24]    A.    MY RELATIONSHIP TO HIM HAS BEEN A BIT
[25] OBTUSE, BECAUSE I'VE NOT BEEN A MAJOR TREATER OF HIM.

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

Page 13

[1]  WHAT I HAVE BEEN HAS BEEN MORE OF A CONSULTANT, IF YOU
[2]  WILL, WHERE THINGS AREN'T GOING WELL AND HE'LL COME TO
[3]  ME TO TRY TO PROBLEM SOLVE; SOMETHING ISN'T WORKING
[4]  RIGHT; I'M NOT GETTING ANYWHERE; WHAT'S GOING ON HERE;
[5]  HOW CAN I GET THROUGH THIS.
[6]      I'LL SAY, HAVE YOU CONSIDERED THESE FIVE
[7]  DIFFERENT THINGS; LET'S LOOK AT THIS.  AND THEN I'LL
[8]  TRY TO CONTACT EITHER -- I'LL TELL HIM TO -- I'LL TELL
[9]  HIM TO DISCUSS THE FIVE THINGS WITH CASSARO OR WHATEVER
[10] DOCTOR HE'S GOING TO AT THAT TIME.  SO I TEND NOT TO BE
[11] DOING THE DIAGNOSTIC WORKUP.  SO I DON'T SEE HIM A LOT.
[12]     OF LATE, THOUGH, HE HAS BEEN CONCERNED ABOUT THE
[13] ATTENTIONAL PROBLEMS.  SO I HAVE TAKEN UP TREATING HIM
[14] FOR, IF YOU WILL, HIS TRAUMATIC-ASSOCIATED
[15] ALZHEIMER'S-LIKE STATE.  SO I'VE STARTED TREATING HIM
[16] FOR THAT, AND I'VE SEEN HIM MORE FREQUENTLY FOR THAT.
[17]     IN THE LAST, I WOULD HAVE TO SAY, TWO MONTHS I'VE
[18] PROBABLY SEEN HIM FOUR OR FIVE TIMES FOR THAT, AND I'M
[19] TREATING HIM WITH MEDICATIONS USED TO TREAT ALZHEIMER'S
[20] DISEASE.
[21]     Q.   WELL, LET ME ASK YOU ABOUT THAT.  ARE YOU
[22] SAYING THAT MR. MCAULEY HAS ALZHEIMER'S?
[23]     A.   THAT'S A TOUGH QUESTION.  TECHNICALLY
[24] ALZHEIMER'S DISEASE IS -- I'VE HAD EXTENSIVE TRAINING
[25] IN NEUROPATHOLOGY.  SO I CAN ANSWER THIS AT ANY LEVEL

Page 14

[1]  YOU WANT.
[2]      THERE IS A CLINICAL PRESENTATION OF ALZHEIMER'S
[3]  DISEASE THAT EVERYBODY RECOGNIZES IN TERMS OF LOSS OF
[4]  EXECUTIVE FUNCTIONING, LOSS OF ATTENTION TO DETAIL.  IF
[5]  I SAY TO AN AVERAGE PERSON ON THE STREET, AUNT MINNIE
[6]  HAS ALZHEIMER'S DISEASE, THEY ARE GOING TO SORT OF
[7]  UNDERSTAND WHAT AUNT MINNIE IS DOING.  THEY ARE GOING
[8]  TO HAVE A PICTURE OF WHAT'S GOING ON WITH AUNT MINNIE.
[9]  THEY WILL UNDERSTAND THAT.  THE FACT OF THE MATTER IS,
[10] MANY THINGS LOOK LIKE ALZHEIMER'S DISEASE.
[11]     HE HAS A TRAUMATIC BRAIN INJURY THAT ACCELERATES
[12] HIS -- THAT IS ACCELERATING WITH RESPECT TO AGE.  IF HE
[13] HAD NOT BEEN IN THIS ACCIDENT, HE WOULD BE FINISHING
[14] BETTER.  AND WE ALL -- THE TERM IS DEMENT.  WE ALL LOSE
[15] CAPACITY AS WE GET OLDER, AND THE RATE AT WHICH WE LOSE
[16] OUR CAPACITY IS -- THERE IS A CERTAIN RATE, AND
[17] EVERYBODY HAS A SET RATE.  WHEN THEY ARE 90 THEY ARE
[18] GOING TO THINK A CERTAIN WAY, AND WHEN THEY ARE 70 THEY
[19] ARE GOING TO THINK A CERTAIN WAY, AND WHEN THEY ARE 50,
[20] RIGHT ON DOWN TO 20.
[21]     SO THE RATE AT WHICH WE LOSE FUNCTIONING IS --
[22] IT'S COMMONLY CALLED THE RATE OF DEMENTING OR THE RATE
[23] THAT WE BECOME DEMENTED OR WE LOSE OUR ABILITY TO
[24] HANDLE INFORMATION.
[25]     WHAT HAS HAPPENED TO DECLAN IS THAT THE TRAUMA

Page 15

[1]  HAS ACCELERATED HIS RATE OF DEMENTIA, HIS DEMENTING
[2]  RATE, AND THAT IS THE HALLMARK OF ALZHEIMER'S DISEASE.
[3]  SO IN THE SENSE THAT HE IS DEMENTING FASTER THAN IT IS
[4]  APPROPRIATE FOR AGE, HE HAS ALZHEIMER'S DISEASE.
[5]      Q.   WHAT DO YOU BELIEVE IS THE MECHANICS OF
[6]  WHAT EXACTLY HAPPENED TO HIS HEAD THAT IS CAUSING THIS
[7]  INCREASED DEMENTING?
[8]      A.   THIS HAS BEEN EXTENSIVELY STUDIED, BOTH THE
[9]  MICROPATHOLOGY AND MACROPATHOLOGY OF HEAD INJURY.  IF
[10] YOU -- THE GERMANS PROBABLY SAID IT BEST.  THE TERM FOR
[11] HEAD INJURY IN THE GERMAN LANGUAGE IS COMMOTIO CEREBRI.
[12] CEREBRI IS THE LATIN TERM FOR THE BRAIN.  COMMOTIO IS
[13] JUST COMMOTION.
[14]     WHAT HAPPENS WHEN THE BRAIN GOES THROUGH A
[15] DECELERATION INJURY IS THAT IT SHAKES BACK AND FORTH
[16] VERY FAST AND WITH GREAT TORSION.  WHEN IT SHAKES BACK
[17] AND FORTH INSIDE THE SKULL, IT PRODUCES MICRO RIPS AND
[18] TEARS OF ALL THE WIRES IN YOUR BRAIN AND THE BLOOD
[19] VESSELS.
[20]     WHAT'S HAPPENED WITH DECLAN IS, ALL THE WIRES IN
[21] HIS BRAIN -- NOT ALL OF THEM BUT A SIGNIFICANT NUMBER
[22] OF THEM HAVE BEEN TORN.  SO HE'S LOST HIS ABILITY TO
[23] THINK.  THE MECHANISMS FOR REPAIRING ORDINARY INJURIES
[24] HAVE BEEN COMPROMISED.
[25]     THE BLOOD VESSELS THAT WENT DOWN TO HIS

Page 16

[1]  PITUITARY, WHICH IS THE MASTER GLAND, PROBABLY WERE
[2]  STRETCHED TO THE POINT OF RIPPING AND PRODUCED
[3]  HEMORRHAGE AND DESTRUCTION OF HIS PITUITARY.  NOW HE
[4]  HAS SOMETHING THAT LOOKS LIKE AN EMPTY SELLA SYNDROME.
[5]      SO ALL OF THESE THINGS HAVE SORT OF COME TOGETHER
[6]  WHERE HE HAS LOST A NUMBER OF THE CONNECTIONS IN HIS
[7]  BRAIN AND THE CONDUITS.  THE BRAIN IS A COMPLEX SYSTEM
[8]  OF MAKING CHEMICALS AND SHIPPING CHEMICALS WITHIN IT TO
[9]  THE REST OF THE BODY.
[10]     THE BRAIN CONTROLS THE ADRENALS, THE TESTICLES IN
[11] THE MALE, THE OVARIES IN THE WOMAN, AND IT'S DONE
[12] THROUGH A COMPLEX MECHANISM OF NERVES AND BLOOD
[13] VESSELS.  THESE ARE THE THINGS THAT HAVE BEEN RIPPED IN
[14] THE PROCESS OF THE BRAIN BEING SHAKEN BACK AND FORTH,
[15] AND THAT'S WHY HIS PITUITARY DOESN'T WORK RIGHT NOW.
[16]     Q.   HOW FAST DO YOU HAVE TO GO -- I MEAN, HOW
[17] FAST DO YOU NEED TO BE SHAKEN UP BEFORE THAT'S A
[18] PROBLEM?
[19]     A.   IT CAN HAPPEN WITH A GUY FALLING OFF OF A
[20] BAR STOOL.  SHAKEN -- THERE IS A THING CALLED TRAUMA
[21] "X" IN BABY -- SHAKEN BABY SYNDROME, WHERE BABIES ARE
[22] ACTUALLY KILLED BY SOME AGGRESSIVE PARENT WHO IS --
[23] POOR IMPULSE CONTROL, WILL SHAKE A BABY TO STOP THEM
[24] FROM CRYING.  SO IT DOESN'T HAVE TO BE INVOLVED IN A
[25] HIGH VELOCITY -- YOU DON'T NEED TO BE GOING 90 MILES AN

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

## Page 17

[1] HOUR.

[2] Q. SO IF DECLAN HAD TOO MUCH TO DRINK AND FELL

[3] OFF A BAR STOOL BUT DIDN'T HIT HIS HEAD ON ANYTHING,

[4] THAT COULD CAUSE IT, JUST FALLING OFF A BAR STOOL AND

[5] LANDING ON HIS REAR END?

[6] A. PROBABLY NOT. YOU WOULD PROBABLY HAVE TO

[7] HIT YOUR HEAD.

[8] Q. OKAY.

[9] A. IT'S THE SUDDEN DECELERATION.

[10] Q. THE WONKING OF THE HEAD PART?

[11] A. THE WONKING OF THE HEAD SEEMS TO DO IT.

[12] THE OTHER THING THAT'S IMPORTANT, AND IT'S BEEN

[13] STUDIED, IS THE HEAD SHOULD BE TURNING A LITTLE BIT.

[14] IF THE HEAD IS TURNED A LITTLE BIT AND YOU HAVE A

[15] DECELERATION INJURY, THAT PRODUCES AN INCREDIBLE AMOUNT

[16] OF MORE INJURY THAN IF YOU ARE JUST STRAIGHT ON. THESE

[17] THINGS HAPPEN IN A MICROSECOND OR TWO AT IMPACT.

[18] Q. SO WHERE DO YOU THINK HE HIT HIS HEAD?

[19] A. I DON'T KNOW.

[20] Q. WAS IT ON HIS TEMPLE, MAYBE, OR --

[21] A. I HAVE NO IDEA.

[22] Q. DID HE TELL YOU WHERE HE HIT HIS HEAD?

[23] A. NO. I REALLY DIDN'T EXPLORE THAT, AND I

[24] REALLY DON'T EVEN HAVE A CLEAR UNDERSTANDING OF THE

[25] MECHANICS OF THE ACCIDENT. I HAVE NOT REALLY EXPLORED

## Page 18

[1] THAT WITH HIM. HE JUST LOOKS LIKE SOMEBODY WHO HAS A

[2] BRAIN INJURY FROM A CAR ACCIDENT.

[3] Q. NOW, YOU MENTIONED THAT YOU'RE CONSULTING.

[4] DO YOU HAVE A DOCTOR/PATIENT RELATIONSHIP WITH HIM?

[5] A. NOW I DO. IT WAS ALWAYS -- PEOPLE COME TO

[6] SEE ME WHEN THEY GET DISTRESSED, AND SOMETIMES I HAVE A

[7] PHYSICIAN/PATIENT RELATIONSHIP, AND SOMETIMES I HAVE

[8] JUST AN ADVISOR RELATIONSHIP. SOMETIMES IT ISN'T CLEAR

[9] EARLY ON WHAT THEY WANT, AND I'M WILLING TO LET THAT

[10] BE.

[11] Q. WHEN DO YOU THINK THAT RELATIONSHIP SHIFTED

[12] OVER FROM WHATEVER IT WAS BEFORE TO THE DOCTOR/PATIENT?

[13] A. IT'S HARD TO SAY.

[14] Q. AFTER THAT FIRST TIME, I GUESS, WHEN YOU

[15] SAW HIM?

[16] A. I WAS -- I'VE NOT REALLY ENGAGED IN A LARGE

[17] AMOUNT OF TREATMENT OF HIM, BECAUSE DR. CASSARO IS

[18] ALREADY DOING AN ENORMOUS AMOUNT OF DAY-TO-DAY CARE.

[19] SO THERE'S NOTHING THAT I WANTED TO DO DIFFERENTLY THAN

[20] DR. CASSARO.

[21] I'VE GOT THE GREATEST RESPECT FOR DR. CASSARO,

[22] AND I PROVIDE HIM AS MUCH SUPPORT AS -- HE CAN PICK UP

[23] THE PHONE AND TALK TO ME, AND I CAN PICK UP THE PHONE

[24] AND TALK TO HIM ON ISSUES SUCH AS THIS, AND SO WE ARE

[25] OF LIKE MIND ON HOW TO MOVE FORWARD ON THESE KINDS OF

## Page 19

[1] PROBLEMS.

[2] SO I DON'T FEEL AS IF I NEED TO -- HOW SHALL I

[3] SAY -- BE ACTUALLY WRITING THE SCRIPS TO BE PART OF THE

[4] TEAM. I HAVE FELT THAT I HAVE BEEN PART OF THE TEAM IN

[5] HIS CARE FROM DAY ONE, BUT A TREATING PHYSICIAN OFTEN

[6] DOES SOMETHING, EITHER WRITING SCRIPS AND THE LIKE.

[7] I'VE ONLY WRITTEN SCRIPS FOR HIM IN THE LAST

[8] COUPLE OF MONTHS, AND IT'S ONLY BECAUSE NO ONE HAD

[9] PICKED UP THE ATTENTIONAL PROBLEMS THAT HE HAD HAD IN A

[10] PROBLEMATIC WAY.

[11] I'VE ASKED -- WHEN I ASK PEOPLE TO MOVE AHEAD AND

[12] THEN PEOPLE TRY AND THEY DON'T HAVE THE SKILL SET TO

[13] MOVE IT FORWARD, THEN I'LL STEP UP TO THE PLATE AND TRY

[14] TO HELP OUT, AND THAT'S WHAT HAPPENED HERE.

[15] Q. SO UP UNTIL THE LAST COUPLE OF MONTHS YOU

[16] HADN'T PRESCRIBED HIM ANY MEDICATIONS?

[17] A. PRETTY MUCH NOT, I DON'T THINK SO.

[18] Q. OR HADN'T DONE ANY TREATMENTS OF HIM OR

[19] ANYTHING LIKE THAT?

[20] A. NO.

[21] Q. NOW, WHEN HE FIRST CAME TO YOU, IT WAS

[22] BECAUSE MR. MUSSLER SENT HIM TO YOU; IS THAT RIGHT?

[23] A. I DON'T RECALL THE PRIMARY THING, BUT

[24] THAT'S PROBABLY THE WAY IT PLAYED OUT.

[25] Q. BECAUSE HE'S THE ONE YOU CHARGED FOR THE

## Page 20

[1] VISIT. THAT'S WHY I WAS ASKING THAT. IN YOUR RECORDS

[2] YOU HAVE THAT YOU CHARGED HIM $500 FOR SOMETHING, AND I

[3] DON'T KNOW IF --

[4] A. I DO INDEPENDENT MEDICAL EXAMS. IT WASN'T

[5] CLEAR WHETHER I WAS SUPPOSED TO TREAT HIM OR TAKE OVER

[6] HIS TREATMENT, AND SO I BASICALLY JUST PERFORMED, I

[7] THINK, AN INDEPENDENT MEDICAL EVAL. THERE MAY BE A

[8] REPORT THAT I DID SOMEWHERE TO THAT EFFECT.

[9] Q. LATER, ON MAY 23, 2006, YOU BILLED

[10] MR. MUSSLER FOR $2,000 FOR A DEPOSITION. DO YOU KNOW

[11] WHAT THAT WAS FOR? THIS IS THE ONLY DEPOSITION IN THIS

[12] CASE, THAT I'M AWARE OF. SO I WAS JUST CURIOUS AS TO

[13] WHAT THAT WAS ALL ABOUT.

[14] A. HE ASKED ME TO DO SOME FOOTWORK WITH

[15] RESPECT TO -- THERE WERE SOME PROBLEMS WITH RESPECT TO

[16] THE DOCUMENTATION OF THE GROWTH HORMONE DEFICIENCY.

[17] Q. WHAT KINDS OF PROBLEMS?

[18] A. IT WAS KIND OF -- MORE OF AN ACADEMIC

[19] QUESTION THAN ANYTHING, AS TO WHAT IS THE DEFINITION OF

[20] GROWTH HORMONE DEFICIENCY. I UNDERSTAND THAT

[21] DR. WINTERS GOT VERY, IF YOU WILL, TIGHT IN HIS

[22] ACADEMIC ADHERENCE TO CERTAIN CRITERIA FOR WHAT DEFINES

[23] HORMONAL DEFICIENCY.

[24] I FELT THEY WERE A LITTLE BIT -- WHILE HIS

[25] OPINIONS ARE CERTAINLY CORRECT, I THOUGHT THEY WERE

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

Page 21

[1] VERY RESTRICTIVE, IF NOT REGRESSIVE, IN THAT MANY
[2] PEOPLE DON'T HAVE GROWTH HORMONE DEFICIENCY THAT'S
[3] WORTH TREATING THAT DON'T FULFILL THE STRICT CRITERIA
[4] THAT HE WAS DEMANDING, AND SO...
[5]     Q.    SO WERE YOU THE ONE WHO HELPED DR. CYRUS
[6] FIGURE OUT WHAT HE NEEDED TO DO?
[7]     A.    NO.  DR. CYRUS FIGURED OUT WHAT HE NEEDED
[8] TO DO ON HIS OWN, BUT IT WAS PRETTY OBVIOUS WHAT NEEDED
[9] TO BE DONE FROM DR. WINTERS.  I AGREED WITH DR. CYRUS'
[10] APPROACH, BUT THE GOLD STANDARD IS THIS VERY
[11] COMPLICATED TESTING INVOLVING TWO SPECIFIC CHEMICALS
[12] DELIVERED AT THE SAME TIME AND NOT SEPARATELY.
[13]     I, FOR ONE, RECOGNIZED THAT THAT'S MAYBE
[14] ACADEMICALLY TRUE, BUT FOR PEOPLE WHO ARE CLINICALLY
[15] SYMPTOMATIC WITH A HISTORY OF TRAUMA, I DON'T THINK YOU
[16] NEED TO DO ALL THAT STUFF.
[17]     SO BECAUSE OF THE NATURE OF THIS PARTICULAR
[18] PROCESS, DR. CYRUS WENT AHEAD AND DID THE MORE
[19] ACADEMICALLY RIGOROUS TEST.  I THINK IT WAS A RISK TO
[20] DECLAN.  I THINK IT WAS AN EXPENSE TO DECLAN.  I
[21] PERSONALLY THINK IT WAS UNNECESSARY FROM A MEDICAL
[22] PERSPECTIVE, BUT IT JUST CLEARS THE WATER.
[23]     Q.    NOW, DO YOU BELIEVE THAT THE TESTS THAT HAD
[24] BEEN DONE WERE SUFFICIENT?
[25]     A.    ABSOLUTELY.  THERE'S NO QUESTION IN MY MIND

Page 22

[1] THAT THEY WERE SUFFICIENT.  I MEAN, I CHECKED WITH THE
[2] F.D.A.  I CHECKED WITH A COUPLE OF -- I CHECKED WITH
[3] MASS GENERAL.  I CHECKED WITH A COUPLE OF OTHER PLACES
[4] ON A NATIONAL LEVEL THAT DOES EXTENSIVE PITUITARY
[5] TESTING.
[6]     I MEAN, THEY ALL -- A ROUTINE BASIS THEY DO THE
[7] GOLD STANDARD TESTS OF THE DOUBLE STIMULATION, BUT THE
[8] F.D.A., WHEN IT RELEASED -- AND I DOUBLECHECKED THIS,
[9] AND THAT'S WHY I TRIED IT, BECAUSE I HAD TO MAKE PHONE
[10] CALLS AND TALK WITH THESE PEOPLE AND GET AHOLD OF
[11] FUNDAMENTAL -- THERE IS A THING CALLED PRE-MARKET
[12] APPROVAL DOCUMENTATION THAT THE F.D.A. GOES THROUGH,
[13] AND THESE ARE A MATTER OF PUBLIC RECORD.
[14]     SO I HAD TO SPEND TIME TRACKING THESE PEOPLE DOWN
[15] TO GET THIS INFORMATION AS TO WHAT TESTS THEY USE TO
[16] ALLOW PEOPLE INTO THEIR STUDIES.  THE TESTS THAT THEY
[17] ALLOWED INTO THE STUDIES WERE EXACTLY THE SAME TESTS
[18] AND STYLE AND PROCESS THAT DR. CYRUS USED, NOT THIS --
[19] THIS DOUBLE TEST THAT EVOLVED, I WOULD SAY, PROBABLY
[20] FOUR OR FIVE YEARS AGO AND BECAME THE GOLD STANDARD
[21] ESTABLISHED BY THE ENDOCRINE SOCIETIES.
[22]     THERE IS A LOT OF POLITICAL REASONS FOR THAT AND
[23] A LOT OF SOCIOECONOMIC EVENTS THAT MAKE GROWTH HORMONE
[24] A PARTICULAR HOT POTATO, NAMELY COST, BUT IT'S AN
[25] IMPORTANT ADJAMENT FOR PEOPLE TO HAVE A PRODUCTIVE LIFE

Page 23

[1] WHEN THEIR PITUITARY ISN'T WORKING.
[2]     Q.    WELL, THEN, WHAT ELSE DID YOU DO?  I
[3] NOTICED THAT YOU CHARGED $3,000 AT THE BEGINNING OF
[4] JUNE TO MR. MUSSLER FOR SOME MORE --
[5]     A.    WELL --
[6]     Q.    -- THAN THE DEPOSITION?
[7]     A.    -- ALL OF THESE THINGS WERE RELATED TO
[8] THAT.
[9]     Q.    ALL RIGHT.  NOW, HOW MUCH HAVE YOU CHARGED
[10] SO FAR ALTOGETHER TO MR. MUSSLER FOR YOUR OPINIONS AND
[11] YOUR ANALYSES AND THINGS?
[12]     A.    I SEEM TO RECALL IT'S ON THE ORDER OF
[13] $5,000 TOTAL.
[14]     Q.    OKAY.  WHAT WE HAVE IS A REPORT THAT YOU
[15] PREPARED BACK ON JULY 14, 2005 AND THEN NOTHING AT ALL
[16] UNTIL, LIKE YOU SAID, JUST LAST MONTH.  DID YOU SEE
[17] MR. MCAULEY AT ALL DURING THAT TIME, BASICALLY A YEAR?
[18]     A.    I DON'T RECALL.  I WOULD HAVE TO CHECK MY
[19] RECORDS.  I DIDN'T SEE HIM MUCH, IF I DID.
[20]     Q.    SO IF IT WAS NOT IN YOUR RECORDS, THEN YOU
[21] DIDN'T SEE HIM?
[22]     A.    NO.
[23]     Q.    YOU DIDN'T TREAT HIM AND/OR WRITE
[24] PRESCRIPTIONS OR ANYTHING LIKE THAT?
[25]     A.    CERTAINLY NO PRESCRIPTIONS.  IF I GAVE HIM

Page 24

[1] A PRESCRIPTION, THERE WOULD BE A PHYSICAL RECORD OF
[2] THAT IN MY RECORDS.
[3]     Q.    DID YOU SEND HIM FOR ANY TESTS?
[4]     A.    I MAY HAVE.  I MAY HAVE SENT HIM FOR SOME
[5] GROWTH HORMONE TESTS AND THINGS LIKE THIS EARLY ON.
[6] BASICALLY, OFTENTIMES WHEN I SEND PEOPLE TO DR. CYRUS,
[7] I KNOW WHAT DR. CYRUS WANTS AS A SCREENING TEST, AND
[8] I'LL ORDER THOSE TESTS JUST TO FACILITATE THINGS, AND
[9] THE TIMING OF THE -- I DON'T RECALL THE PRECISE TIMING.
[10]     SOMETIMES WHAT HAPPENS IS, I'LL ORDER THE TESTS,
[11] LOOK AT THEM MYSELF AND THEN MAKE A CALL TO CYRUS,
[12] SOMETIMES I'LL MAKE THE CALL TO CYRUS AND THEN ORDER
[13] THE TESTS AND THEN BE DONE WITH IT.
[14]     Q.    BUT IF YOU DID, IT WOULD BE IN YOUR FILE?
[15]     A.    YES.
[16]     Q.    MAY I LOOK AT YOUR FILE?
[17]     A.    SURE.
[18]     Q.    NOW, IS THIS YOUR COMPLETE FILE FOR
[19] MR. MCAULEY?
[20]     A.    YES.
[21]     Q.    HAS ANYTHING BEEN TAKEN OUT, OR IS IT KEPT
[22] IN ANOTHER PLACE OR ANYTHING LIKE THAT?
[23]     A.    I WOULDN'T THINK SO.
[24]     Q.    NOTHING WAS TAKEN OUT BEFORE THE DEPOSITION
[25] BECAUSE IT RELATED --

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July  25, 2006

---

Page 25

[1]      A.     NO.   THERE MAY ACTUALLY BE SOME WORK
[2]  PRODUCT IN THERE.   SO LET ME JUST MAKE SURE THAT
[3]  THERE'S NO WORK PRODUCT.
[4]      Q.     WHAT EXACTLY DO YOU MEAN BY WORK PRODUCT?
[5]      A.     LETTERS TO MR. MUSSLER.
[6]      Q.     AND YOU WANT TO TAKE THOSE OUT?
[7]      A.     I THINK IT'S APPROPRIATE, DON'T YOU?
[8]      Q.     WELL, IS HE YOUR LAWYER?
[9]      A.     NO, BUT HE HAS A RIGHT TO PRIVATE AND
[10]  PRIVILEGED COMMUNICATIONS WITH ME, I UNDERSTAND.
[11]      Q.     IF HE'S YOUR LAWYER, HE DOES.
[12]      A.     THAT MAY BE YOUR PERSPECTIVE.   LET ME JUST
[13]  DOUBLECHECK AND MAKE SURE THAT --
[14]          MR. MUSSLER:   I AM NOT DR. CHANGARIS' LAWYER.
[15]          MS. LOUCKS:   THEN I DON'T KNOW THAT THERE'S A
[16]  PRIVILEGE ANYWHERE.
[17]          MR. MUSSLER:   YOU CAN TAKE IT UP WITH THE COURT.
[18]      A.     I HAVE LETTERS TO MR. MUSSLER THAT I'M
[19]  TAKING OUT THAT ARE JUST STRICTLY TO MR. MUSSLER.
[20]      Q.     SO YOU WANT TO REMOVE YOUR PRIVATE
[21]  COMMUNICATIONS WITH MR. MUSSLER?
[22]      A.     RIGHT.
[23]      Q.     DID YOU DISCUSS THE FILE OR THE CASE WITH
[24]  MR. MUSSLER BEFORE THIS DEPOSITION?
[25]      A.     PARDON?

---

Page 26

[1]      Q.     DID YOU DISCUSS THE FILE OR THE CASE WITH
[2]  MR. MUSSLER BEFORE THE DEPOSITION?
[3]      A.     YES.
[4]      Q.     WHAT DID YOU TALK ABOUT?
[5]      A.     I REVIEWED THE --
[6]      Q.     YOU'RE TAKING LOTS OF RECORDS OUT OF THAT
[7]  FILE.
[8]      A.     WELL, THEY HAVE NOTHING TO DO WITH THE
[9]  CASE.   SOME OF THIS STUFF HAS TOTALLY NOTHING TO DO
[10]  WITH THE CASE.   I HAVEN'T LOOKED AT THIS.   SOME OF IT
[11]  HAS TO DO WITH JUST GENERAL GROWTH HORMONE ISSUES.
[12]      Q.     DID YOU RELY ON THOSE DOCUMENTS WHEN YOU
[13]  WERE EVALUATING MR. MCAULEY?
[14]      A.     NO.   THOSE DOCUMENTS WERE STRICTLY RELATED
[15]  TO THE INFORMATION RELATED TO THE GROWTH HORMONE AT THE
[16]  NATIONAL LEVEL, THE PROS AND CONS AND THINGS LIKE THAT.
[17]      Q.     WELL, BACK TO THE QUESTION ABOUT
[18]  MR. MUSSLER; DID YOU SPEND SOME TIME TALKING WITH HIM
[19]  ABOUT THE CASE BEFORE THE DEPOSITION?
[20]      A.     YES.
[21]      Q.     WHAT KINDS OF THINGS DID YOU-ALL TALK
[22]  ABOUT?
[23]      A.     I ASKED HIM TO MAKE SURE QUESTIONS LIKE,
[24]  WHAT OTHER ACCIDENTS HAD HE BEEN IN; WHAT OTHER
[25]  TREATMENTS DID HE HAVE THAT I MIGHT NOT BE FULLY AWARE

---

Page 27

[1]  OF; WAS THERE ANYTHING THAT I WAS MISSING THAT HE MIGHT
[2]  BE AWARE OF; AND BASICALLY WHAT PROBLEMS THERE WOULD BE
[3]  WITH ANY OF THE INFORMATION THAT -- IF HE WAS AWARE OF
[4]  IF THERE WAS ANY INFORMATIONAL GAPS THAT I WOULD NEED
[5]  TO BE COGENT IN MY OPINIONS; IN OTHER WORDS, WERE MY
[6]  OPINIONS DEFENSIBLE.
[7]      Q.     WERE THERE ANY GAPS IN YOUR INFORMATION?
[8]      A.     NOT SO MUCH GAPS AS THERE WAS SOME NEW
[9]  INFORMATION WITH RESPECT TO PRIOR INJURIES, THAT WHEN I
[10]  BECAME AWARE OF THEM IT WAS GOOD TO KNOW ABOUT THEM,
[11]  BUT IT DIDN'T CHANGE MY OPINION AS TO THE RELATIONSHIP
[12]  BETWEEN HIS CURRENT SYMPTOMS AND THE ACCIDENT OF RECORD
[13]  IN THIS PROCEEDING.
[14]      Q.     WHAT PRIOR INJURIES DID MR. MUSSLER BRING
[15]  YOU UP-TO-DATE ABOUT?
[16]      A.     I THINK THERE HAD BEEN AN ACCIDENT -- I MAY
[17]  HAVE EVEN BEEN AWARE OF IT, BUT I JUST WASN'T COGNITIVE
[18]  OF IT, IN THE SENSE THAT IT MAY BE IN MY INITIAL
[19]  REPORT.   APPARENTLY HE WAS INVOLVED IN A MOTOR VEHICLE
[20]  ACCIDENT, MAYBE NINE OR TEN MONTHS BEFORE THIS
[21]  ACCIDENT.   IT WAS MINOR, SELF-LIMITING.   IT INVOLVED
[22]  ONE VISIT TO A DOCTOR, OR TWO, OR SOMETHING LIKE THAT.
[23]      Q.     AND MR. MUSSLER TOLD YOU ABOUT THAT ONE?
[24]      A.     YES, AND I'VE ALSO CORROBORATED THIS WITH
[25]  DECLAN.

---

Page 28

[1]      Q.     DID YOU TALK TO HIM ABOUT THAT TODAY?
[2]      A.     YES.
[3]      Q.     MAY I SEE THE NEW AND IMPROVED, CLEANER
[4]  FILE?
[5]      A.     YES.
[6]      Q.     AND IS THIS UP TO DATE?   I'M ASSUMING IT
[7]  DOESN'T HAVE TODAY'S VISIT IN HERE.   WOULD YOU PREPARE
[8]  A DOCUMENT FROM YOUR VISIT TODAY?   IS THAT THE NORMAL
[9]  THING TO DO?
[10]      A.     RIGHT.
[11]      Q.     WHEN HE COMES IN, DO YOU ASK HIM ANY
[12]  PARTICULAR QUESTIONS, OR DOES HE JUST TELL YOU WHAT
[13]  HE'S FEELING OR WANTS YOU TO KNOW?   HOW DOES THAT WORK?
[14]      A.     ACTUALLY, HERE IS TODAY'S.
[15]      Q.     OH, THANK YOU.
[16]      A.     AND THEN I ASKED HIM -- FOR SOME REASON OR
[17]  ANOTHER I HADN'T RECEIVED IN THE MAIL THE LATEST
[18]  TESTING RESULTS FROM DR. CYRUS.   I ASKED FOR THAT, AND
[19]  MR. MUSSLER WAS KIND ENOUGH TO PROVIDE THAT FOR ME.
[20]          MS. LOUCKS:   I WOULD LIKE TO MARK THIS AS EXHIBIT
[21]  TWO, WITH THE EXTRA DOCUMENT FROM TODAY AS WELL, AND
[22]  INTRODUCE IT INTO THE DEPOSITION.
[23]          (REPORTER'S NOTE:   DEPOSITION EXHIBIT 2 WAS
[24]  RETAINED BY THE WITNESS AND WAS TO BE FORWARDED AT A
[25]  LATER TIME.)

---

Page 29

[1]    Q.   NOW, YOU SAID YOU WERE IN CONVERSATION WITH
[2] DR. CYRUS ON A FAIRLY REGULAR BASIS?
[3]    A.   NO, NO.
[4]    Q.   OH, I'M SORRY.  YOU DIDN'T SAY THAT?
[5]    A.   I SAID IN THE PAST I HAVE, BUT I DON'T KNOW
[6] THAT I'VE HAD A CONVERSATION -- A DIRECT CONVERSATION
[7] WITH DR. CYRUS ON DECLAN.
[8]    Q.   OH, OKAY.  I SEE.  BUT DR. CASSARO, YOU'VE
[9] SPOKEN WITH HIM; IS THAT CORRECT?
[10]    A.   NO.
[11]    Q.   NOT ON MR. MCAULEY?  OKAY.
[12]    A.   THESE ARE PEOPLE THAT I HAVE WHAT I CALL
[13] DEEP PROFESSIONAL RELATIONSHIPS WITH, AND I PROBABLY
[14] WOULDN'T SPECIFICALLY TALK TO THEM ABOUT SPECIFIC
[15] CASES.  IT'S MORE THAT WE UNDERSTAND HOW WE TREAT
[16] SPECIFIC PROBLEMS, AND WE ARE IN AGREEMENT ON THEM.
[17]    Q.   SO YOU HAVEN'T ACTUALLY CONSULTED WITH ANY
[18] OF MR. MCAULEY'S PHYSICIANS SPECIFICALLY ABOUT HIS
[19] CONDITION OR SYMPTOMS OR TREATMENT?
[20]    A.   NOT ON THE PHONE, BUT I GET, YOU KNOW,
[21] LETTERS AND THINGS LIKE THAT.
[22]    Q.   AND ALL THOSE LETTERS WOULD BE IN YOUR
[23] FILE?
[24]    A.   I WOULD HOPE, BUT THIS FILE HAS BEEN TAKEN
[25] APART AND PUT TOGETHER SO MANY TIMES, IT WOULD BE HARD

Page 30

[1] TO GUARANTEE THAT EVERYTHING IS IN THERE AND COMPLETE,
[2] BUT PRETTY MUCH -- AS I SAID, I'VE BEEN OUT ON THE
[3] PERIPHERY OF THIS CASE.  I'VE DONE VERY LITTLE.
[4]       EVERYTHING WITH RESPECT TO MY TREATMENT OF HIM IS
[5] CERTAINLY HERE, BUT I DON'T KNOW THAT I HAVE ALL THE
[6] RECORDS IN MY POSSESSION.  I THINK ONE TIME I ASKED
[7] MR. MUSSLER IF I COULD LEAF THROUGH ALL OF THE RECORDS
[8] HE HAD, AND HE WAS KIND ENOUGH TO DO IT.
[9]       THEY ARE EXTENSIVE, AND IT WOULD BE COSTLY, AND I
[10] DIDN'T WANT TO HAVE THREE FEET OF RECORDS ON MY SHELF
[11] FROM THIS CASE.  SO I'VE HAD A CHANCE TO THUMB THROUGH
[12] A GOOD BIT OF MR. MUSSLER'S PRIVATE RECORDS TO SEE WHAT
[13] OTHER DOCTORS HAVE SAID ON OCCASION.
[14]       BUT AGAIN, MY INPUT HAS BEEN PRIMARILY ONE OF
[15] COACHING AND DIAGNOSTIC.  IT HAS NOT BEEN ONE OF WHAT I
[16] CONSIDER TO BE EXTENSIVE TREATMENT, WHERE I WOULD NEED
[17] TO KNOW EXACTLY WHAT EVERYBODY ELSE IS DOING BECAUSE OF
[18] WHAT I WOULD BE DOING WOULD BE AFFECTED BY OTHER
[19] PEOPLE.
[20]    Q.   HOW ARE YOU GETTING PAID FOR YOUR COACHING
[21] AND EVALUATION OF MR. MCAULEY?  WHO IS PAYING FOR
[22] THAT?
[23]    A.   IT'S MY UNDERSTANDING THAT MR. MCAULEY IS
[24] PAYING FOR THE HEALTH CARE THAT I DELIVER HIM.  I'M
[25] TRYING TO KEEP THAT SEPARATE, WHERE THE HEALTH CARE --

Page 31

[1] WHICH HAS BEEN VERY LIMITED.
[2]       AS I SAID, I PROBABLY MET WITH HIM, PROBABLY,
[3] THREE OR FOUR TIMES, AND THEN THE IMPAIRMENT
[4] EVALUATIONS AND THE LIKE WERE, OF COURSE, LEGAL
[5] DOCUMENTS.  IF I DID SOMETHING -- AGAIN, I WOULD HAVE
[6] TO DOUBLECHECK TO SEE EXACTLY HOW I HANDLED THAT.  IT'S
[7] BEEN SO LONG SINCE I'VE HANDLED THIS.
[8]    Q.   NOW, IN YOUR REPORT ON JULY 14, 2005 YOU
[9] STATE THAT MR. MCAULEY WAS SEAT-BELTED AT THE TIME OF
[10] THE ACCIDENT.  HOW DO YOU KNOW THAT?
[11]    A.   PATIENT REPORT.
[12]    Q.   JUST FROM HIS REPORT?
[13]    A.   YES.
[14]    Q.   DID YOU EVER SEE ANY DOCUMENTS, ANY MEDICAL
[15] RECORDS THAT SUGGESTED THAT HE HAD ANY INJURIES FROM A
[16] SEAT BELT OR ANY INJURIES BASICALLY IN HIS FRONT OR
[17] CHEST OR NECK AREA?
[18]    A.   NO, BUT HE DOES COMPLAIN OF -- DID COMPLAIN
[19] OF CHEST PAIN, BUT AGAIN, I WAS NOT INVOLVED IN THE
[20] TREATMENT OF THE PAIN AND SEQUELAE OF HIS TRAUMA.  I
[21] WAS BASICALLY SOMEBODY THAT LOOKED AT HIM FROM A
[22] MACRO-PERSPECTIVE, AND THAT'S WHAT I OFFERED HIM.
[23]    Q.   AND YOU ALSO MENTION A BRAIN
[24] ACCELERATION/DECELERATION INJURY.  DID YOU DO ANY TESTS
[25] TO REACH THAT DIAGNOSIS, OR DID YOU TAKE THE DIAGNOSIS

Page 32

[1] OF HIS OTHER DOCTORS AS BEING TRUE, AND THAT'S WHY YOU
[2] PUT IT IN YOUR REPORT?
[3]    A.   WELL, HE HAD BEEN IN AN ACCIDENT, AND HE
[4] WASN'T FUNCTIONING WELL ALONG THE CRITERIA THAT I USE
[5] FOR SOMEBODY WHO HAS BEEN BRAIN-INJURED.
[6]    Q.   SO BASED UPON HIS REPORTING OF WHAT HE WAS
[7] DOING AND NOT DOING?
[8]    A.   RIGHT, AND THE WAY HE LOOKED.
[9]    Q.   HOW DID HE LOOK?
[10]    A.   PEOPLE HAVE A FLAT AFFECT.  THEY DON'T
[11] HANDLE INFORMATION.  WHEN YOU ARE AROUND ENOUGH
[12] BRAIN-INJURED SOULS AS I HAVE BEEN, YOU JUST OFTENTIMES
[13] CAN SENSE IT.
[14]    Q.   DID HE HAVE ANY TROUBLE UNDERSTANDING YOU?
[15]    A.   NO.  THIS MAN IS A VERY BRIGHT MAN.  WHEN
[16] YOU DEAL WITH VERY BRIGHT PEOPLE, IT'S MORE SUBTLE
[17] THINGS, LIKE HOW WELL THEY PICK UP ON A JOKE, HOW QUICK
[18] THEY ARE TO SMILE, HOW THEY MOVE THEIR HEAD, LAPSES IN
[19] WORDS.  THEY MIGHT CHOOSE ONE WORD AS OPPOSED TO
[20] ANOTHER WORD, A TWO-SYLLABLE WORD INSTEAD OF A
[21] FOUR-SYLLABLE WORD, FOR FAIRLY BRIGHT PEOPLE, THAT KIND
[22] OF THING; WHEREAS, MOST PEOPLE ARE JUST SORT OF
[23] MISSIVE.
[24]       I TEASE PEOPLE THAT IF YOU ARE A MATHEMATICIAN
[25] AND YOU CAN ONLY RECITE PI TO 10 DECIMAL POINTS, YOU'VE

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

---

Page 33

[1] GOT A PROBLEM; WHEREAS, MOST OF US PROBABLY WOULD JUST
[2] ASK FOR A FORK.
[3]     Q.     DID I LAUGH SOON ENOUGH?
[4]            NOW, DID YOU HAVE AN OPPORTUNITY TO LOOK AT
[5] ANY OF MR. MCAULEY'S ACTUAL BRAIN SCANS OR X-RAYS OR
[6] ANYTHING LIKE THAT?
[7]     A.     NO.
[8]     Q.     AND YOU HAD MENTIONED IN YOUR REPORT THAT
[9] MR. MCAULEY WAS DISORIENTED AND NAUSEATED IMMEDIATELY
[10] AFTER THE ACCIDENT.  THAT'S FROM WHAT HE TOLD YOU?
[11]    A.     YES.
[12]    Q.     OBVIOUSLY YOU WEREN'T STANDING THERE
[13] WATCHING HIM?
[14]    A.     NO.
[15]    Q.     YOU MENTION IN YOUR REPORT THAT MR. MCAULEY
[16] HAD BEEN EXPERIENCING HEADACHES SINCE THE ACCIDENT.  IS
[17] IT YOUR UNDERSTANDING THAT THOSE HEADACHES WERE
[18] CONSTANT OR THEY WOULD COME AND GO?
[19]    A.     I HAVE TO READ THE REPORT.  I USUALLY LIST
[20] THAT.
[21]    Q.     SO IF IT SAYS CONSTANT, THEN THAT'S WHAT HE
[22] TOLD YOU?
[23]    A.     RIGHT.
[24]    Q.     YOU ALSO MENTION THAT DR. CLARK BERNARD
[25] DIAGNOSED POST-CONCUSSIVE SYNDROME.  WHO IS

---

Page 34

[1] DR. BERNARD?
[2]     A.     I DON'T KNOW.
[3]     Q.     YOU DON'T KNOW HIM AT ALL?
[4]     A.     NO.
[5]     Q.     YOU DON'T KNOW WHAT KIND OF DOCTOR HE IS OR
[6] ANYTHING LIKE THAT?
[7]     A.     NO.
[8]     Q.     WHAT IS POST-CONCUSSIVE SYNDROME?
[9]     A.     IF YOU HIT SOMETHING WITH A HAMMER, YOU
[10] CONCUSS IT.  SO ANYTIME A HEAD HITS SOMETHING OR IT'S
[11] SHAKEN, IT'S CONSIDERED A CONCUSSIVE EVENT.
[12]    Q.     SO --
[13]    A.     THAT'S A CONCUSSION.
[14]    Q.     -- JUST WHACKING MY HEAD LIKE
[15] THAT (INDICATING).
[16]    A.     RIGHT.
[17]    Q.     BUT I DON'T THINK I HAVE BRAIN DAMAGE.
[18]    A.     NO.  YOU PROBABLY DIDN'T HIT IT --
[19]    Q.     IT WOULD HAVE TO BE MUCH HARDER?
[20]    A.     QUITE A BIT HARDER, BUT TECHNICALLY IT'S A
[21] CONCUSSION THAT YOU JUST DID TO YOURSELF.
[22]    Q.     SO I COULD COME TO YOU AND YOU WOULD HELP
[23] ME?
[24]    A.     WELL, IT ALL DEPENDS ON HOW MUCH HELP
[25] YOU'RE ASKING FOR.

---

Page 35

[1]     Q.     I PROBABLY WOULD NEED A LOT OF HELP.  YOU
[2] MENTION ON NOVEMBER 4 OF 2003 THAT DR. BERNARD REPORTS
[3] THAT MR. MCAULEY EXPERIENCES BACK PAIN OCCASIONALLY AND
[4] HEADACHES.  DOES THAT GO WITH WHAT HE TOLD YOU, THE
[5] SAME KIND OF THING, BACK PAIN OCCASIONALLY AND
[6] HEADACHES?
[7]     A.     BASICALLY.
[8]     Q.     DO YOU KNOW HOW MANY NEUROLOGISTS OR
[9] NEUROSURGEONS THAT MR. MCAULEY HAS BEEN TO SEE --
[10]    A.     NO.
[11]    Q.     -- OR HOW MANY DOCTORS OF ANY SORT?
[12]    A.     I HAVEN'T KEPT TABS ON THAT.
[13]    Q.     DID HE TELL YOU THE DIFFERENT DOCTORS HE
[14] HAD BEEN TO SEE?
[15]    A.     I'M SURE HE HAS, BUT I HAVEN'T KEEP TRACK
[16] OF IT, AND I COULDN'T SAY RIGHT NOW.
[17]    Q.     AND SINCE YOU HAVEN'T HAD A CHANCE TO LOOK
[18] AT THE RECORDS, YOU DON'T KNOW IF THEY ALL HAVE THE
[19] SAME OPINION OR IF ALL OF THE DOCTORS --
[20]    A.     CORRECT.  THE ONLY PEOPLE THAT I'M REALLY
[21] FLUENT WITH THEIR DIAGNOSES WOULD BE CASSARO AND CYRUS.
[22] I AM FAMILIAR WITH SOME OF THE OPINIONS OF
[23] DR. ALTOBELLIS.
[24]    Q.     NOW, DR. CASSARO, WHAT KIND OF DOCTOR IS
[25] HE?

---

Page 36

[1]     A.     A NICE ONE.  HE'S AN ANESTHESIOLOGIST.
[2]     Q.     BUT HE'S NOT AN ENDOCRINOLOGIST, THOUGH?
[3]     A.     WELL, YOU KNOW, HE FANCIES HIMSELF AN
[4] ENDOCRINOLOGIST.  HE'S SOMEBODY, LIKE MYSELF, WHO HAS
[5] AN INTEREST IN IT.  HE APPROACHES ENDOCRINOLOGY FROM
[6] THE PERSPECTIVE OF PAIN.
[7]            PAIN INTERFACES WITH THE ENDOCRINE SYSTEM IN A
[8] VERY CLEAR WAY.  SO ANYBODY WHO TREATS PAIN HAS TO BE
[9] AWARE OF ENDOCRINE FUNCTIONING.  SO HE'S SOMEBODY WHO
[10] HAS MADE THE CONNECTION, AND THAT'S ONE OF THE REASONS
[11] WHY I LIKE DR. CASSARO, IS BECAUSE HIS BRAIN
[12] UNDERSTANDS THAT CONNECTION, AND SO WE CAN TALK.
[13]           IT'S NOT A PUSH FOR PEOPLE WHO HAVE NOT MADE THE
[14] CONNECTION THAT THE BRAIN AND THE NEUROENDOCRINE SYSTEM
[15] ARE RELATED, THAT THERE'S A REAL LEARNING CURVE, BUT IN
[16] HIS PRACTICE HE DOES MANY OF THE SAME TESTS THAT I
[17] RECOMMEND, SAME STYLE, INSULIN-LIKE GROWTH FACTORS,
[18] THYROID TESTS AND ALL THE STUFF, BECAUSE ALL THESE
[19] THINGS GET DISORDERED IN PAIN SYNDROMES.  THAT'S WHY
[20] PEOPLE GAIN WEIGHT AFTER TRAUMA.
[21]           SO IN ONE SENSE HE HAS SPECIALTY UNDERSTANDING OF
[22] TRAUMATIC ENDOCRINE DISEASE; IN OTHER WORDS, WHAT IS
[23] THE RELATIONSHIP BETWEEN PAIN AND THE ENDOCRINE SYSTEM.
[24] HE UNDERSTANDS THAT INTER-RELATIONSHIP WELL.
[25]           NOW, DOES HE UNDERSTAND ALL OF ENDOCRINOLOGY?

---

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

Page 37

[1] WELL, HE'S NOT AN ENDOCRINOLOGIST.  SO I WOULDN'T WANT
[2] TO SAY THAT HE HAS THAT ENTIRE SKILL SET.  BUT DOES HE
[3] UNDERSTAND THE EFFECTS OF PAIN ON THE ENDOCRINE SYSTEM?
[4] HE PROBABLY UNDERSTANDS THAT BETTER THAN MOST
[5] ENDOCRINOLOGISTS, BECAUSE HE TREATS MORE PEOPLE IN THAT
[6] AREA.  HE UNDERSTANDS THEIR PROBLEMS.  NOW, HE MAY NOT
[7] BE DOING ALL THE TESTS THAT THE ENDOCRINOLOGIST DOES TO
[8] DO THIS, BUT HE UNDERSTANDS THE CLINICAL IMPACT.
[9]     Q.    BUT HE'S NOT A NEUROLOGIST OR A
[10] NEUROSURGEON; HE HASN'T HAD THE TRAINING THAT YOU'VE
[11] HAD, CERTAINLY?
[12]    A.    HE DOESN'T DO TRAUMA.  HE HASN'T DONE
[13] TRAUMA.  HE LIKES THE ENDOCRINE MANIFESTATIONS OF PAIN.
[14] I KNOW HE'S TURNED ON BY THAT.  HE GETS REAL
[15] EXCITEMENT, BECAUSE WHEN HE TREATS SOMEBODY'S ENDOCRINE
[16] FUNCTIONING, YOU CAN REALLY HELP THEIR PAIN.  NOW THEY
[17] HAVE MANAGED THEIR PAIN.
[18]        SO IT'S ONE OF THOSE AREAS THAT IT -- WHEN YOU
[19] BECOME AWARE OF IT, HAS REAL WORLD EFFECT.  WHEN YOU
[20] HELP SOMEBODY'S NEUROENDOCRINE SYSTEM THAT'S NOT
[21] FUNCTIONING BECAUSE OF PAIN, YOU IMPROVE THEIR PAIN.
[22]        SO ONCE THAT'S HAPPENED TO YOU A COUPLE OR THREE
[23] TIMES, THEN YOU REALLY WANT TO LEARN ABOUT THE SYSTEM,
[24] AND THAT'S WHAT HAS HAPPENED TO HIM.  SO NOW HE HAS
[25] A -- I DON'T KNOW WHAT PERCENTAGE OF HIS PRACTICE -- HE

Page 38

[1] MANAGES JUST THE ENDOCRINE SIDE OF IT, BUT HE ACTUALLY
[2] ADVERTISES PAIN AND ENDOCRINE TREATMENT.  I DON'T, BUT
[3] HE LIKES DOING IT.  SO HE ADVERTISES IT.
[4]    Q.    WHEN YOU SAW MR. MCAULEY BACK IN 2005, DID
[5] HE EXPRESS ANY PROBLEMS WITH HIS VISION AT THAT TIME?
[6]    A.    EVERYBODY COMPLAINS OF VISION AFTER HAVING
[7] A TRAUMA, AND IT'S ONE OF THE MOST DIFFICULT AREAS TO
[8] ASSESS.  IT TAKES A HIGHLY SPECIALIZED OPHTHALMOLOGIST
[9] TO MAKE THE DOCUMENTATION ON THAT.  I CAN SPEND A LONG
[10] TIME -- IF YOU WANT TO GO THROUGH IT, I CAN DISCUSS
[11] WITH YOU WHY IT'S HARD.
[12]    Q.    WELL, ACTUALLY, I WAS JUST WONDERING WHAT
[13] SPECIFICALLY HE SAID TO YOU, NOT NECESSARILY THE EXACT
[14] WORDS BECAUSE IT WAS A WHILE AGO --
[15]    A.    I DON'T RECALL.  I'VE NOT REALLY ADDRESSED
[16] THAT AREA WITH HIM SPECIFICALLY, BUT VISUAL FIELD
[17] CHANGES AND VISUAL ACUITY CHANGES ARE REAL COMMON.  I
[18] WOULD BE SURPRISED, QUITE FRANKLY, GIVEN THE FACT THAT
[19] HIS PITUITARY WAS KNOCKED OUT IN THIS ACCIDENT, THAT
[20] HIS VISION WASN'T ALSO AFFECTED.
[21]    Q.    AND YOU ARE SURE THAT THE PITUITARY WAS
[22] KNOCKED OUT IN THE ACCIDENT?
[23]    A.    IN MY OPINION.  I'M NOT THE GOOD LORD HERE.
[24] I DON'T -- WITHIN REASONABLE MEDICAL PROBABILITY I
[25] BELIEVE THAT THE ACCIDENT CAUSED HIS PITUITARY

Page 39

[1] INSUFFICIENCY.
[2]    Q.    SO IF YOU HAD IN YOUR RECORDS A NOTATION
[3] ABOUT VISION PROBLEMS, THEN HE PROBABLY WOULD HAVE SAID
[4] SOMETHING TO YOU ABOUT VISION PROBLEMS; AND IF YOU
[5] DIDN'T HAVE IT IN YOUR RECORD --
[6]    A.    IT JUST WOULD BE AN OVERSIGHT ON MY PART.
[7]    Q.    WOULD YOU EXPECT HIM TO MENTION SOMETHING
[8] ABOUT HIS VISION?
[9]    A.    NOT NECESSARILY.  PEOPLE COME IN -- THAT'S
[10] THE TROUBLE WITH HEAD-INJURED PATIENTS.  THEY GET
[11] DISTRACTED BASED UPON WHAT THEY ARE FEELING AT THE
[12] MOMENT.  SO IF THE BIGGEST PROBLEM TODAY IS HEADACHES,
[13] THEN THAT'S ALL THEY ARE GOING TO TALK ABOUT TO THE
[14] EXCLUSION OF THE FACT THAT THEY ARE BLEEDING OR THEY
[15] HAVE A BROKEN FOOT OR SOMETHING.  IT'S REALLY
[16] INTERESTING TO DEAL WITH HEAD-INJURED PATIENTS IN THAT
[17] RESPECT.
[18]    Q.    WHEN YOU EVALUATED MR. MCAULEY BACK ON JULY
[19] 14, 2005, YOU GAVE HIM -- YOU WROTE A REPORT ON THAT,
[20] AND YOU HAVE A NEUROLOGIC PHYSICAL EXAMINATION SECTION.
[21] YOU SAY A VARIETY OF THINGS HERE THAT I JUST WANTED TO
[22] ASK YOU ABOUT.  YOU SAY, "THE NEUROLOGICAL EXAM OF THE
[23] HEAD AND NECK SHOWED NORMAL MENTATION IN TERMS OF
[24] IDEATION AND COHERENT THOUGHTS."
[25]    MR. MUSSLER:  WHAT PAGE ARE YOU ON?

Page 40

[1]    MS. LOUCKS:  I'M ON PAGE SIX OF THE REPORT.
[2]    Q.    "THE WORDS WERE CLEAR AND NOT PRESSURED OR
[3] LABORED.  THE GRASP OF RECENT CURRENT EVENTS WAS
[4] APPROPRIATE FOR AGE.  SERIAL SEVENS WERE NORMALLY
[5] PERFORMED.  SHORT-TERM MEMORY WAS GROSSLY INTACT,
[6] REMEMBERING THREE WORDS/OBJECTS FOR 10 MINUTES."
[7]    WERE THERE ANY TESTS THAT YOU REMEMBER
[8] PERFORMING, ANY QUESTIONS YOU ASKED HIM WHERE HE DIDN'T
[9] GIVE YOU THE RESPONSES THAT YOU WANTED TO HEAR OR
[10] RESPONSES THAT YOU THOUGHT WERE INAPPROPRIATE?
[11]    A.    NO.  IT WAS ALWAYS APPROPRIATE.
[12]    Q.    YOU HAVE --
[13]    A.    NOW, REMEMBER, THE NEUROLOGIC EXAM DOES NOT
[14] PICK UP THIS KIND OF BRAIN INJURY.  YOU NEED TO DO
[15] NEUROPSYCHOLOGICAL TESTING.  YOU NEED TO DO ENDOCRINE
[16] TESTING.  YOU NEED TO DO SECONDARY TESTING.  SO I WOULD
[17] EXPECT THERE TO BE A NORMAL NEUROLOGIC EXAM IN THIS
[18] SETTING --
[19]    Q.    SO YOU WOULD --
[20]    A.    -- WHICH IS WHAT HE HAD.
[21]    Q.    SO EVERYTHING THAT YOU TESTED WAS -- THE
[22] VISUAL FIELDS WERE GROSSLY INTACT.  THERE WAS NO
[23] EVIDENCE OF ESOTROPIA, ESOPHORIA OR REPORTED DIPLOPIA.
[24] NOW, I KNOW WHAT DIPLOPIA IS; THAT'S DOUBLE VISION.
[25] BUT I'M AFRAID I DON'T KNOW WHAT ESOTROPIA AND

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

Page 41

[1]  ESOPHORIA ARE.  WHAT ARE THOSE?

[2]     A.    THOSE HAVE TO DO WITH THE EYE MOVEMENT,

[3]  WHETHER OR NOT YOU GET DOUBLE VISION WITH THE EYES.

[4]     Q.    SO THAT WAS ALL FINE?

[5]     A.    THAT WAS JUST PERFECT.

[6]     Q.    GREAT.  AND YOU SAY, "SUBJECTIVE TASTE AND

[7]  SWALLOWING WERE NORMAL."

[8]     A.    CORRECT.

[9]     Q.    DID YOU GIVE HIM THINGS TO TASTE OR --

[10]     A.    WELL, THAT'S SUBJECTIVE.  HE REPORTED THAT.

[11]     Q.    OKAY.  HE SAID EVERYTHING TASTES FINE?

[12]     A.    YES.

[13]     Q.    WHAT ABOUT SMELL; DID HE SAY THAT HE COULD

[14]  SMELL?  THOSE ARE KIND OF THE SAME THING, AREN'T THEY,

[15]  TASTE AND SMELL?

[16]     A.    THEY CAN BE.  70 PERCENT OF TASTE IS SMELL.

[17]     Q.    SO HE DIDN'T HAVE ANY PROBLEMS WITH THAT,

[18]  AS FAR AS YOU KNOW?

[19]     A.    I DON'T RECALL.

[20]     Q.    AND THEN TOWARDS THE BOTTOM OF THE PAGE YOU

[21]  DID SOME TESTS ON HIM, AND YOU HAVE IN THE MIDDLE OF

[22]  THE PARAGRAPH, "THERE ARE NORMAL PLANTAR FLEXION

[23]  RESPONSES BILATERALLY."  WHAT ARE PLANTAR FLEXION

[24]  RESPONSES?

[25]     A.    IF YOU TICKLE THE BOTTOM OF THE FEET, THE

Page 42

[1]  TOES GO DOWN.

[2]     Q.    AND THAT WAS --

[3]     A.    NORMAL.

[4]     Q.    THEY WENT IN THE RIGHT DIRECTION?

[5]     A.    YES.  HE HAD A NORMAL EXAM.

[6]     Q.    NOW, YOU ALSO MENTION -- THIS IS A LITTLE

[7]  LATER IN YOUR REPORT UNDER IMPRESSION.  YOU MENTION

[8]  THAT MR. MCAULEY HAS MILD DEPRESSION.  WHAT BROUGHT YOU

[9]  TO THAT CONCLUSION?

[10]     A.    WE DO AN INTERVIEW PROCESS, AND WE ALSO

[11]  HAVE A SERIES OF QUESTIONS.  WE USE A HAMILTON

[12]  SCREENING TOOL.  AND PEOPLE WHO HAVE DIFFICULTY

[13]  SLEEPING AND CONCENTRATING END UP HAVING MILD

[14]  DEPRESSION, AND HE WAS HAVING THAT.

[15]     Q.    DID HE TELL YOU WHY HE WAS HAVING TROUBLE

[16]  SLEEPING?

[17]     A.    PEOPLE DON'T KNOW WHY THEY ARE HAVING

[18]  TROUBLE SLEEPING.  IT'S JUST THEY KNOW THEY ARE.

[19]     Q.    AND CONCENTRATION, DID HE GIVE YOU ANY --

[20]  DID HE JUST SAY, I'M HAVING TROUBLE CONCENTRATING, OR

[21]  DID HE GIVE YOU SPECIFIC EXAMPLES OF WHERE HE'S HAVING

[22]  DIFFICULTY?

[23]     A.    MAINLY WITH HIS WORK, AS I RECOLLECT.  HE

[24]  WAS HAVING DIFFICULTY IN HIS WORK.

[25]     Q.    ANY SPECIFIC EXAMPLES OF WHAT --

Page 43

[1]     A.    NONE THAT I CAN RECOLLECT, NO.

[2]     Q.    IS IT SOMETHING THAT IF YOU HAD WRITTEN IT

[3]  DOWN, THEN THAT WOULD BE SOMETHING HE WOULD HAVE TOLD

[4]  YOU?

[5]     A.    WELL, THERE IS A CERTAIN UTILITY HERE.  YOU

[6]  KNOW, THERE IS A LOT OF WORK TO DOING ALL THESE

[7]  DIFFERENT THINGS, AND I'M NOT SURE THAT I WOULD RECORD

[8]  EVERYTHING TO JUSTIFY PERSONAL OPINION THAT WAS GOING

[9]  TO BE CORROBORATED BY THE NEUROPSYCHOLOGICAL TESTING.

[10]     AT THIS POINT I CAN SAY THAT THROUGH THE

[11]  INTERVIEW TECHNIQUES I DEVELOP A STRONG SUSPICION IF A

[12]  PERSON HAS THE SAME -- AN INJURY TO HIS NEUROENDOCRINE

[13]  SYSTEM AND TO HIS COGNITIVE FUNCTION.

[14]     Q.    WHEN YOU SPOKE WITH HIM, DID HE TELL YOU

[15]  ABOUT BEING DEPRESSED BEFORE THE ACCIDENT, ANYTIME IN

[16]  THE PAST BEFORE THE ACCIDENT?

[17]     A.    I CAN'T RECALL EXACTLY WHEN I BECAME AWARE

[18]  OF ALL THE DIFFERENT COMPONENTS OF HIS DEPRESSION, BUT

[19]  I UNDERSTAND THAT HE DID HAVE A PERIOD OF TIME WHERE HE

[20]  DID EXPRESS SOME FRUSTRATION WITH LIFE AND DIFFERENT

[21]  PROBLEMS WITH HIS FAMILY PHYSICIAN THAT WERE

[22]  SELF-LIMITING AND JOB-RELATED FOR A PERIOD OF ABOUT A

[23]  YEAR AND-A-HALF SOMETIME IN THE PAST.

[24]     I DON'T THINK THEY WERE OPERANT AROUND THE TIME

[25]  OF THE ACCIDENT, AND I DON'T THINK THAT THE SYMPTOMS

Page 44

[1]  THAT HE RELATED WERE PRESENT.  WE ARE VERY CLEAR IN OUR

[2]  HISTORY WITH THESE SYMPTOMS THAT YOU'RE TALKING ABOUT

[3]  NOW.

[4]     WHEN WE RECORD THE SYMPTOMS OF DEPRESSION, IF

[5]  THEY'VE SAID THEY'RE NOT SLEEPING, WE'LL SAY, WAS THIS

[6]  PRESENT BEFORE THE ACCIDENT; NO -- THEY'LL SAY YES OR

[7]  NO.  IF IT'S YES, BEFORE THE ACCIDENT, WE DON'T RECORD

[8]  IT.  SO WE ONLY REPORT THE SYMPTOMS THAT WERE PRESENT

[9]  AFTER THE ACCIDENT.

[10]     Q.    SO IT WAS UP TO HIM TO TELL YOU WHAT WAS --

[11]  WHAT WERE THE SYMPTOMS THAT HE BELIEVED WERE

[12]  POST-ACCIDENT?

[13]     A.    ALL THE EVALUATIONS OF DEPRESSION IN THE

[14]  REPORT ARE FROM THE PATIENT.

[15]     Q.    DID HE EVER TALK ABOUT ANY PRIOR ANXIETY OR

[16]  ANY OTHER PSYCHOLOGICAL PROBLEMS?

[17]     A.    HE HAS HAD ANXIETY IN THE PAST, BUT AGAIN,

[18]  NONE OF THESE WERE PRESENT AROUND THE TIME OF THE

[19]  ACCIDENT, AND THE SYMPTOMS HE'S HAD WITH INCREASING

[20]  DIFFICULTIES HAVE ALL BEEN MADE WORSE BY THE ACCIDENT,

[21]  BY REPORT.

[22]     Q.    DID HE TELL YOU ABOUT THE THINGS THAT HE

[23]  COULD DO, LIKE HIS TRAVELING AND VACATIONS AND THINGS

[24]  LIKE THAT?  WAS THAT RELEVANT AT ALL TO YOUR ANALYSIS?

[25]     A.    HE FUNCTIONS REASONABLY WELL WITH HIS

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

---

Page 45

[1] ACTIVITIES OF DAILY LIVING, BUT HE'S A HIGH-FUNCTIONING
[2] MAN.  HE'S LOST HIS ABILITY -- HIS EXECUTIVE
[3] FUNCTIONING, WHICH IS WHAT HAPPENS IN A HEAD INJURY.
[4]    Q.    WHAT EXACTLY IS EXECUTIVE FUNCTIONING?
[5]    A.    THE ABILITY TO MULTITASK, THE ABILITY TO
[6] HANDLE STRESS, THE ABILITY TO DECODE PEOPLE'S INTENT.
[7] THESE ARE ALL EXECUTIVE FUNCTIONS.
[8]    Q.    SO HE'S KIND OF DOCKED DOWN TO GENERAL
[9] MANAGEMENT?
[10]    A.    NO.  HE'S PROBABLY DOCKED DOWN TO THE POINT
[11] OF -- WELL, YOU KNOW, ON A GOOD DAY HE MIGHT BE ABLE TO
[12] RUN A CASH REGISTER, BUT DON'T STRESS HIM.  I WOULDN'T
[13] HIRE HIM TO RUN MY CASH REGISTER.
[14]    Q.    NOW, IN YOUR REPORT YOU GIVE SOME
[15] IMPAIRMENT RATINGS AT THE END, AND YOU PROVIDE A 29
[16] PERCENT WHOLE PERSON IMPAIRMENT FOR THE TRAUMATIC BRAIN
[17] INJURY; IS THAT CORRECT?
[18]    A.    THAT'S WHAT I WROTE A YEAR AND-A-HALF AGO
[19] WITH VERY LITTLE INFORMATION.  THERE'S A LOT OF STUFF
[20] THAT'S COME UP SINCE THEN.  THAT'S JUST AN ESTIMATE.
[21] IT'S PROBABLY HIGHER THAN THAT, BASED UPON THE NEW
[22] INFORMATION.  I HAVE NOT DONE AN IMPAIRMENT EVALUATION
[23] OF LATE.  IT PROBABLY WARRANTS ONE TO PUT TOGETHER ALL
[24] THIS OTHER STUFF.
[25]    Q.    AND BASED UPON THE ANALYSIS YOU DID OF HIM

---

Page 46

[1] AT THAT TIME, YOU CAME UP WITH 29 PERCENT?
[2]    A.    BASICALLY THAT WOULD BE THE LOW END FOR --
[3] IMPAIRMENT HAS A RELATIONSHIP TO DISABILITY, BUT IT
[4] ISN'T ONE TO ONE.  YOU MAY HAVE A ONE PERCENT
[5] IMPAIRMENT IF YOU LOSE AN INDEX FINGER, BUT IF YOU'RE A
[6] CONCERT PIANIST, YOU ARE NOT GOING TO PLAY THE PIANO
[7] ANYMORE AT A CONCERT LEVEL.  SO YOU ARE 100 PERCENT
[8] DISABLED FROM THAT CAREER.  SO YOU HAVE TO BE AWARE
[9] THAT THERE IS A DIFFERENCE BETWEEN -- A 29 PERCENT
[10] BRAIN IMPAIRMENT MIGHT MEAN THAT HE'S TOTALLY DISABLED.
[11] SO YOU HAVE TO DEAL WITH THE LANGUAGE HERE.
[12]    Q.    NOW, IS THAT YOUR OPINION, THAT HE'S
[13] TOTALLY DISABLED NOW?
[14]    A.    FROM HIS PRIOR PROFESSION, YES.  HE'S A
[15] LIKEABLE FELLOW.  I'M SURE HE COULD WORK AT SOMETHING
[16] BUT CERTAINLY NOWHERE NEAR WHAT HE DID BEFORE.
[17]    Q.    HE'S A CHARMING GUY.
[18]    A.    YES.
[19]    Q.    VERY LIKEABLE, AS YOU SAID, AND A VERY GOOD
[20] SALESMAN.
[21]    A.    RIGHT.
[22]    Q.    WHEN YOU EVALUATED HIM AT THAT TIME, YOU
[23] GAVE HIM SOME PERMANENT RESTRICTIONS, AND YOU LIMITED
[24] HIM TO WHAT YOU CALLED MINIMAL LIFTING, LESS THAN 20
[25] POUNDS, NO UNPROTECTED HEIGHTS, CRAWLING, CLIMBING,

---

Page 47

[1] TWISTING, BENDING, STOOPING, SQUATTING, OVERHEAD WORK
[2] OR REPETITIVE MOVEMENT OF THE NECK OR LOWER BACK, AND
[3] THEN YOU SAID, "THE CLIENT, MR. MCAULEY, MAY REQUIRE
[4] BREAKS EVERY HOUR OR TWO TO STRETCH OR CHANGE
[5] POSITIONS.  THE GENERAL JOB CLASSIFICATION WOULD
[6] INCLUDE LIGHT DUTY OR SEDENTARY WORK FOR WHICH HE IS
[7] LIKELY TO BE SUCCESSFUL."  IS THAT STILL YOUR OPINION,
[8] OR HAVE YOU CHANGED THAT OPINION?
[9]    A.    IT'S PRETTY CLEAR TO ME THAT HE HAS A BRAIN
[10] INJURY, AND I PROBABLY WAS NOT FULLY AWARE OF THE
[11] DEGREE OF HIS LOSS OF EXECUTIVE FUNCTIONING AS HAS
[12] BECOME APPARENT SINCE I INITIALLY EVALUATED HIM.  SO IF
[13] HE DIDN'T HAVE A BRAIN INJURY, I WOULD PROBABLY SAY,
[14] YES, THOSE ARE PERMANENT RESTRICTIONS.
[15]       NOW THAT HE HAS A BRAIN INJURY -- I MEAN, THE
[16] ABILITY TO DO ADAPTIVE BEHAVIORS; IN OTHER WORDS,
[17] HANDLE STRESS, HANDLE AN IRATE CUSTOMER, IT'S BECOME
[18] VERY LIMITING IN THEIR FUNCTIONING AT HIGH-LEVEL JOBS.
[19]       IF YOU CAN'T HANDLE SOMEBODY, IF YOU CAN'T FIGURE
[20] OUT WHY THEY ARE GETTING UPSET, THEN YOU ARE NEVER
[21] GOING TO MAKE A SALE.  IF YOU CAN'T FIGURE OUT HOW TO
[22] MAKE SOMEBODY HAPPY, CAN'T ORGANIZE, CAN'T REMEMBER
[23] THEIR BIRTHDAYS, PIECE IT TOGETHER -- ALL THESE THINGS
[24] WORK TOGETHER.  ESSENTIALLY HE'S NOT GOING TO BE
[25] SUCCESSFUL.  SO HE DOESN'T HAVE THAT.

---

Page 48

[1]    Q.    WELL, WHAT HAS MADE YOUR OPINION CHANGE
[2] FROM THIS POINT TO TODAY?
[3]    A.    WELL, THE FACT THAT HE'S HAD A DOCUMENTED
[4] NEUROENDOCRINE DYSFUNCTION WITH RESPECT TO HIS
[5] PITUITARY.  I'VE HAD MANY OPPORTUNITIES TO TALK WITH
[6] HIM NOW, AND I'VE SEEN THAT HE CAN'T FUNCTION VERY
[7] WELL.
[8]    Q.    WHAT DID YOU ASK HIM TO DO THAT HE COULDN'T
[9] DO?
[10]    A.    HE JUST DOESN'T FOCUS WELL.  I MEAN, I HAVE
[11] TO BE VERY CAREFUL WHEN I'M DISCUSSING -- HE'S VERY
[12] EXCITABLE.  EVERYTHING I PROPOSE TO HIM, HE -- HE'S
[13] JUST VERY EXCITABLE.  IT'S HARD FOR HIM TO STAY ON
[14] TASK.
[15]    Q.    AND, OF COURSE, YOU DIDN'T KNOW HIM BEFORE
[16] THE ACCIDENT?
[17]    A.    NO.
[18]    Q.    YOU MENTIONED EARLIER THAT ONE OF THE
[19] EFFECTS, IF YOU WILL, OF HAVING A PITUITARY PROBLEM IS
[20] WEIGHT GAIN.  IS THAT SOMETHING YOU'VE NOTICED WITH
[21] MR. MCAULEY?
[22]    A.    NO.
[23]    Q.    IS THAT UNUSUAL, THAT A PERSON WHO
[24] ALLEGEDLY HAS A PITUITARY INJURY DOESN'T GAIN WEIGHT?
[25]    A.    SOMEBODY CAN LOSE WEIGHT WITH A PITUITARY

---

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

---

Page 49

[1] INJURY. THE BRAIN IS A PRETTY COMPLICATED STRUCTURE.
[2] CERTAIN INJURIES WILL CAUSE WEIGHT GAIN. CERTAIN
[3] INJURIES WILL CAUSE WEIGHT LOSS. CERTAIN GLOBAL
[4] INJURIES WILL KEEP EVERYTHING ABSOLUTELY THE SAME.
[5]     Q.    THE GROWTH HORMONE IN PARTICULAR, ISN'T
[6] THAT ONE THAT IS KNOWN TO CAUSE WEIGHT GAIN,
[7] PARTICULARLY IN THE STOMACH AREA?
[8]     A.    NO.
[9]     Q.    NOT AT ALL?
[10]    A.    AS A MATTER OF FACT, PEOPLE WHO HAVE GROWTH
[11] HORMONE DEFICIENCY WILL GAIN WEIGHT, AND WHEN THEY GET
[12] PUT BACK ON GROWTH HORMONE, THEY WILL HAVE A WEIGHT
[13] LOSS. THE PEAR-SHAPED WOMAN IS BECAUSE SHE HAS LOST
[14] HER GROWTH HORMONE.
[15]    SO WHEN YOU SEE WOMEN GOING FROM 30 TO 45 AND
[16] THEY HAVE BECOME PEAR-SHAPED, IT'S BECAUSE THEY DON'T
[17] HAVE THAT GROWTH HORMONE IN THEIR BODY. IT'S DROPPING
[18] OUT. SO THIS IS A VERY VAGUE AND HOT AREA, IF YOU
[19] WILL, THAT WOMEN ARE JUST NOW DISCOVERING. WHEN THEY
[20] FINALLY DO, THERE'S GOING TO BE SOME VERY INTERESTING
[21] INTERACTIONS WITH THE VARIOUS BODIES.
[22]    Q.    NOW, HOW DOES -- FOR AN ORDINARY WOMAN WHO
[23] REACHES -- YOU KNOW, GOING FROM 30 TO 40, HER GROWTH
[24] HORMONE DEPLETES, THAT'S NOT FROM SOMEBODY HITTING HER;
[25] THAT'S JUST NORMAL --

---

Page 50

[1]     A.    IF YOU WOULD CALL IT NORMAL IN THE SENSE
[2] THAT IT HAPPENS, BUT I WOULD OFFER TO YOU THAT A
[3] 40-YEAR-OLD WOMAN WHO'S GAINED 35, 40 POUNDS AND NOW
[4] LOOKS LIKE A PEAR DOES NOT FEEL SHE'S NORMAL.
[5]     Q.    NOW, DO MEN GO THROUGH THAT TOO?
[6]     A.    TO A DEGREE. TESTOSTERONE DROPS, MENOPAUSE
[7] AND THINGS LIKE THIS ARE NORMAL BUT NOT DESIRABLE. SO
[8] A LOT OF PEOPLE WILL OPT TO GO ON GROWTH HORMONE.
[9]     Q.    FOR COSMETIC REASONS?
[10]    A.    IF YOU WILL, FOR COSMETIC REASONS. IT'S A
[11] HOTLY DEBATED ISSUE AS TO WHETHER OR NOT INSURANCE --
[12] MEDICAL INSURANCE COMPANIES SHOULD COVER THIS KIND OF
[13] THING.
[14]    Q.    NOW, YOU MENTIONED NEUROPSYCHOLOGICAL
[15] COUNSELING AT THE END OF YOUR REPORT. DO YOU KNOW IF
[16] MR. MCAULEY EVER WENT FOR ANY OF THAT?
[17]    A.    I DON'T RECALL THAT HE DID.
[18]    Q.    HE HASN'T TOLD YOU HE'S SEEING A THERAPIST
[19] AND EVERYTHING IS GREAT OR ANYTHING LIKE THAT?
[20]    A.    MY BRAIN IS A BLANK RIGHT NOW. WE'VE BEEN
[21] AT THIS NOW FOR AN HOUR AND 45 MINUTES --
[22]    Q.    ALMOST, BUT NOT QUITE. 15 MORE MINUTES.
[23]    A.    -- AND SO I JUST DON'T RECALL THAT.
[24]    Q.    DO YOU KNOW WHAT MR. MCAULEY DID ON A
[25] TYPICAL DAY IN HIS JOB BEFORE THE ACCIDENT?

---

Page 51

[1]     A.    NO.
[2]     Q.    DID HE TELL YOU WHAT HE DID ON A TYPICAL
[3] DAY, SAY, IN 2004?
[4]     A.    NO.
[5]     Q.    YOU PREPARED A LETTER IN JUNE OF -- JUNE
[6] 22, 2006 FOR MR. MUSSLER. DO YOU REMEMBER WHY YOU PUT
[7] THE LETTER TOGETHER? HERE'S A COPY OF IT. THAT MIGHT
[8] HELP YOU OUT A LITTLE BIT.
[9]     A.    I PROBABLY DID IT IN RESPONSE TO A REQUEST
[10] TO PROVIDE WHAT'S CALLED A SUMMARY LETTER AS OF JUNE
[11] WITH RESPECT TO DECLAN'S TOTAL CARE.
[12]    Q.    YOU GIVE YOUR OPINION THAT MR. MCAULEY IS
[13] TOTALLY DISABLED AND HIS CONDITION IS PERMANENT. NOW,
[14] DO YOU HAVE ANY VOCATIONAL TRAINING, IN PARTICULAR
[15] VOCATIONAL REHABILITATION TRAINING?
[16]    A.    WELL, NOT PARTICULARLY IN TRAINING. IT'S
[17] JUST THAT I'M -- BECAUSE I'M NO LONGER OPERATING AND I
[18] HAVE DONE SO MUCH WORK WITH HEAD-INJURED PEOPLE -- I
[19] TAKE CARE OF A LOT OF HEAD-INJURED PATIENTS IN THIS
[20] OFFICE.
[21]    SO I DO THE MEDICAL MANAGEMENT OF A NUMBER OF
[22] PEOPLE WHO HAVE SIGNIFICANT TRAUMATIC BRAIN INJURIES,
[23] AND ON OCCASION THEY'LL ZIP IN AND OUT OF FRAZIER REHAB
[24] AND DIFFERENT THINGS.
[25]    THE REHAB -- INTENSIVE BRAIN REHAB IS VERY, VERY

---

Page 52

[1] EXPENSIVE. MY TREATMENT IS RELATIVELY CHEAP. SO I CAN
[2] MANAGE PEOPLE COST EFFECTIVELY FOR LONG PERIODS OF TIME
[3] WITHOUT HAVING TO PUT PEOPLE THROUGH A LOT OF DIFFERENT
[4] THINGS.
[5]     SO IT'S NOT THAT I HAVE PARTICULAR TRAINING.
[6] IT'S JUST THAT I'VE HAD AN INTEREST IN BRAIN INJURY,
[7] AND THAT CONSTITUTES A LARGE -- NOT A LARGE PART, BUT I
[8] PROBABLY HAVE, MAYBE, BETWEEN 10 AND 20 PEOPLE IN MY
[9] PRACTICE WHO HAVE MODERATE TO SEVERE BRAIN INJURIES
[10] THAT I MANAGE ALL THEIR MEDICATIONS FOR PAIN, THINKING,
[11] THINGS LIKE THIS.
[12]    Q.    WAS THIS LETTER WRITTEN TO PROVIDE
[13] MR. MCCAULEY WITH BACKUP FOR HIS SOCIAL SECURITY
[14] DISABILITY OR SOMETHING LIKE THAT?
[15]    A.    I DON'T KNOW WHAT IT'S BEING USED FOR. I
[16] JUST TRY TO PROVIDE ACCURATE INFORMATION TO WHOEVER
[17] ASKS IT. I COULD HAVE ADDRESSED THIS LETTER TO YOU,
[18] AND I WOULDN'T HAVE CHANGED ONE WORD IN IT.
[19]    Q.    YOU MENTION HE HAS SHORT-TERM MEMORY
[20] DEFICITS. WHEN DID THOSE START UP?
[21]    A.    THEY WERE PROBABLY THERE ALL ALONG.
[22]    Q.    YOU DIDN'T NOTICE THEM AT THE BEGINNING,
[23] THOUGH. THERE'S NOTHING IN YOUR REPORT.
[24]    A.    THOSE ARE BY REPORT, AND THEY WERE PRESENT
[25] FROM THE TIME OF THE ACCIDENT. SO THE QUESTION IS, HOW

---

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

Page 53

[1] ARE YOU GOING TO RESPOND TO THEM, AND HOW ARE YOU GOING
[2] TO DOCUMENT THEM.
[3]      THE BEST WAY TO DOCUMENT THEM IS WITH A
[4] NEUROPSYCHOLOGIST.  SHORT OF THAT, IT'S JUST A MATTER
[5] OF TALKING TO THEM AND SAYING, IS IT BAD ENOUGH TO TAKE
[6] MEDICINES.  MOST PEOPLE DON'T WANT THINGS WRONG WITH
[7] THEM, AND SO THEY'LL SAY, NO, NO, I'M JUST FINE; DON'T
[8] GIVE ME ANY MEDICINES; I DON'T WANT TO TAKE A PILL.
[9] THEN THAT'S AS FAR AS IT GOES.
[10]     THEN THREE YEARS LATER WHEN THEY ARE FORGETTING
[11] THEIR WALLET IN PLACES OR LEAVING THE STOVE ON AND
[12] NEARLY BURNING THE HOUSE DOWN, THEY SAY, WELL, MY
[13] SHORT-TERM MEMORY IS PRETTY BAD, DOC; MY WIFE THINKS
[14] I'M GOING TO BURN THE HOUSE DOWN.  THEN THEY GET READY
[15] TO TAKE A PILL.  THAT'S SORT OF WHAT HAPPENED HERE, IS
[16] THAT HE JUST FINALLY GOT TO THE POINT WHERE HE REALIZED
[17] THAT HE WASN'T THINKING CLEARLY.  SO WE STARTED TO AID
[18] HIS SHORT-TERM MEMORY.
[19]     Q.    WHAT WAS HE TAKING FOR THAT, WHAT
[20] MEDICATION?  DID YOU PRESCRIBE HIM SOMETHING?
[21]     A.    YES, NAMENDA.
[22]     Q.    WHAT WAS THAT?  I'M SORRY.
[23]     A.    NAMENDA, N-A-M-E-N-D-A.  IT'S AN N-METHYL-D
[24] ANTAGONIST, N.M.D.A. ANTAGONIST, THAT PEOPLE USE FOR
[25] TREATING ALZHEIMER'S DISEASE.

Page 54

[1]      Q.    THAT'S THE ALZHEIMER'S MEDICATION THAT YOU
[2] WERE TALKING ABOUT EARLIER --
[3]      A.    YES.
[4]      Q.    -- BECAUSE OF HIS TELLING YOU THAT THERE
[5] WERE THINGS THAT HE COULDN'T REMEMBER?
[6]      A.    AND HE WAS HAVING TROUBLE CONCENTRATING AND
[7] FOCUSING AND THINGS LIKE THIS.  HE'S BEEN CONSISTENT
[8] ABOUT THAT FROM DAY ONE.
[9]      Q.    FROM THE FIRST TIME YOU SAW HIM --
[10]     A.    RIGHT.
[11]     Q.    -- BACK IN 2005?
[12]     A.    RIGHT.
[13]     Q.    AND I THINK YOU SAID -- WE WERE TALKING
[14] ABOUT ALZHEIMER'S A LITTLE BIT AGO.  YOU WERE TALKING
[15] ABOUT MORE OF THE EXTERNAL BEHAVIORS.  IS THERE ANY
[16] KIND OF CHEMICAL CHANGE OR SOMETHING PHYSICAL THAT CAN
[17] BE SEEN IN MR. MCAULEY'S BRAIN THAT LED YOU TO A
[18] DIAGNOSIS OF ALZHEIMER'S?
[19]     A.    AGAIN, THAT'S NOT A -- YOU'RE GOING TO PUT
[20] ME IN ACADEMIC HOT WATER HERE.  YOU'RE PUTTING WORDS IN
[21] MY MOUTH.  I DON'T THINK THIS MAN HAS CLASSIC
[22] ALZHEIMER'S DISEASE.
[23]     HE HAS SYMPTOMS THAT ONE WOULD ASSOCIATE WITH
[24] ALZHEIMER'S DISEASE, AND THESE SYMPTOMS, I THINK, WERE
[25] CAUSED WITH TRAUMA.  HE HAS TRAUMATIC PROGRESSIVE

Page 55

[1] DEGENERATIVE BRAIN DISEASE.
[2]      Q.    SO YOU BELIEVE HE'S GETTING WORSE?
[3]      A.    YES.  HE'S DEMENTING FASTER THAN HE WOULD
[4] BE HAD HE NOT BEEN IN AN ACCIDENT.
[5]      Q.    IS THAT THE USUAL COURSE OF A TRAUMATIC
[6] BRAIN INJURY?
[7]      A.    YES.
[8]      Q.    THAT YOU START OFF AS GOOD AS YOU ARE GOING
[9] TO GET RIGHT AFTER THE ACCIDENT, AND THEN YOU PROGRESS
[10] AND YOU GET WORSE AND WORSE AS TIME GOES ON?
[11]     A.    YOU DEMENT MORE QUICKLY THAN THE AVERAGE
[12] PERSON.  IT'S VERY COMMON.
[13]          (OFF-THE-RECORD COMMENTS)
[14]     Q.    I THINK YOU MAY HAVE ALREADY ANSWERED THIS,
[15] BUT I WAS -- WHAT SPECIFIC TASKS IS MR. MCAULEY NOW
[16] UNABLE TO DO?  AND I THINK YOU MAY HAVE ANSWERED THAT.
[17] YOU WERE TALKING ABOUT THE EXECUTIVE FUNCTIONING.  IS
[18] THAT WHAT YOU MEANT BY THAT?
[19]     A.    YES.
[20]     Q.    ARE THOSE THE SPECIFIC THINGS THAT HE -- HE
[21] CAN'T DO MORE THAN ONE THING AT A TIME?  IS THAT WHAT
[22] YOU'RE SAYING?
[23]     A.    RIGHT.
[24]     Q.    AND WITH REGARD TO STRESS -- WHAT MAKES HIM
[25] ANGRY?  IS IT EVERYTHING MAKES HIM ANGRY OR --

Page 56

[1]      A.    HE JUST CAN'T PROCESS.  YOU JUST GET
[2] FRUSTRATED AND YOU DON'T PROCESS.  I'M SURE YOU'VE
[3] ENCOUNTERED PEOPLE THAT ARE TOUCHY AND YOU SAY, HOW IS
[4] THE WEATHER, AND THEY YELL AT YOU.  IT'S THAT KIND OF
[5] THING THAT HAPPENS HERE.
[6]      YOU CAN'T PREDICT WHEN HE'S GOING TO GET
[7] FRUSTRATED.  HE COULD BE FOCUSING ON THE SHOE IS NOT
[8] FITTING RIGHT, AND ALL OF A SUDDEN YOU ASK HIM ABOUT,
[9] WELL, DID YOU PICK UP THE EGGS, DEAR, AND THEN YOU HAVE
[10] AN ALTERCATION.
[11]     Q.    AND IS THIS SOMETHING THAT'S BEEN A PROBLEM
[12] PRETTY MUCH FROM THE TIME OF THE ACCIDENT?
[13]     A.    I WOULD THINK SO.
[14]     Q.    DID YOU EVER TAKE INTO CONSIDERATION THE
[15] ISSUES OF SECONDARY GAIN?  HOW DO YOU RULE THAT OUT
[16] FROM YOUR ANALYSIS?
[17]     A.    SECONDARY GAIN IS A -- IS YOUR PARTICULAR
[18] BATON NOIR, YOUR BLACK PIECE, AND I DO NOT HAVE A MAGIC
[19] WAND TO BE ABLE TO SORT OUT SECONDARY GAIN.
[20]     Q.    DOES IT EVEN COME INTO YOUR CONSIDERATION,
[21] OR IS IT SOMETHING THAT YOU JUST PUT ASIDE AND DON'T
[22] THINK ABOUT?
[23]     A.    WELL, THE QUESTION IS ONE OF MALINGERING;
[24] IN OTHER WORDS -- TO ME, SECONDARY GAIN IS ONE THING.
[25] WHAT IS SECONDARY GAIN TO YOU MAY BE COMPENSATION TO

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

Page 57

[1] HIM.

[2]      THE QUESTION IS WHETHER OR NOT HE HAS A REAL

[3] INJURY, AND THEN YOU FOLKS ARE ARGUING OVER HOW MUCH TO

[4] COMPENSATE FOR THAT.  NO MATTER HOW YOU DEFINE IT, THE

[5] PERSON PAYING IS ALWAYS GOING TO FEEL THAT THIS IS

[6] SECONDARY GAIN, BECAUSE IT'S PRIMARY LOSS.  MY PRIMARY

[7] LOSS IS YOUR SECONDARY GAIN.  SO IT'S VERY HARD TO SORT

[8] THAT OUT.

[9]      BUT THE QUESTION OF MALINGERING, WHEN IT GETS

[10] DOVETAILED WITH SECONDARY GAIN, IS VERY PROBLEMATIC.

[11] HOW DO YOU DETERMINE MALINGERING.  IT'S VERY HARD, BUT

[12] PEOPLE WHO ARE BRAIN-INJURED CAN'T DO IT.  THEY CAN'T

[13] FAKE IT CONSISTENTLY.

[14]      THIS MAN IS BRAIN-INJURED.  I MEAN, YOU HAVE

[15] OBVIOUS EVIDENCE OF BRAIN NON-FUNCTIONING.  YOU HAVE

[16] CHEMICAL EVIDENCE THAT HIS BRAIN ISN'T FUNCTIONING.

[17] PEOPLE LIKE THAT CANNOT BE CONSISTENT.  A MALINGERER

[18] HAS TO BE CONSISTENT ALL THE TIME, AND IT'S REALLY HARD

[19] TO CATCH THEM IN INCONSISTENCIES, SOMEBODY WHO IS

[20] MALINGERING.

[21]      Q.   NOW, WHEN YOU SAY, CHEMICAL EVIDENCE, DO

[22] YOU MEAN THE GROWTH HORMONE TESTS?

[23]      A.   RIGHT.

[24]      Q.   DO YOU MEAN ANY OTHER TESTS BY THAT?

[25]      A.   WELL, THAT'S AN OBJECTIVE TEST.

Page 58

[1]      Q.   RIGHT.

[2]      A.   I MEAN, THERE'S NO WAY THAT ANYBODY COULD

[3] MALINGER THAT TEST, AND SO WE DO HAVE CLEAR OBJECTIVE

[4] EVIDENCE THAT HIS BRAIN IS NOT FUNCTIONING.

[5]      Q.   BECAUSE OF THE GROWTH HORMONE TEST?

[6]      A.   YES.

[7]      Q.   WHAT ABOUT TESTOSTERONE AND THYROID, DO YOU

[8] CONSIDER THOSE TO SHOW ABNORMAL --

[9]      A.   WELL, THEY ARE HIGHLY SUGGESTIVE.  YOU CAN

[10] ARGUE THESE THINGS ACADEMICALLY UP THE WAZOO.  IN MY

[11] OPINION THEY ARE DISORDERED IN RELATIONSHIP TO THE

[12] TRAUMA.  I RECOGNIZE THAT OTHER KNOWLEDGEABLE GOOD

[13] PEOPLE CAN LOOK AT IT AND QUIBBLE, BUT WE ARE TALKING

[14] ABOUT THE HYPOTHALAMUS.

[15]      IT'S AN ORGAN THE SIZE OF A WALNUT THAT'S

[16] RESPONSIBLE FOR TESTOSTERONE, GROWTH HORMONE

[17] REGULATION, THYROID FUNCTIONING, ADRENAL FUNCTIONING.

[18] WE ARE TALKING ABOUT EIGHT OR TEN MAJOR FUNCTIONINGS,

[19] AND THIS AREA HAS BEEN GIGGED IN A TRAUMA.

[20]      IT'S TOP HAS LITERALLY BEEN RIPPED, AND TISSUE

[21] HAS BEEN DESTROYED IN THE PROCESS OF HIS BRAIN INJURY,

[22] AND THAT'S THE FOUNDATION FOR IT NOT FUNCTIONING.  IT

[23] JUST -- IT'S LOGICAL TO ME THAT YOU ARE GOING TO HAVE

[24] SOME DISORDERED FUNCTIONING IN THE INTERACTION OF ALL

[25] THESE DIFFERENT THINGS.

Page 59

[1]      SO GIVEN THAT, HE HAS EVIDENCE OF A BRAIN INJURY.

[2] PEOPLE WHO ARE BRAIN-INJURED DON'T HAVE THE ABILITY TO

[3] MALINGER.  THEY CAN'T PUT IT TOGETHER.  MALINGERERS --

[4] YOU'VE GOT TO BE REALLY SHARP TO BE A MALINGERER.

[5]      Q.   VERY INTELLIGENT?

[6]      A.   YOU HAVE TO BE SHARP.  YOU HAVE TO BE

[7] INTENTIONAL.  IT TAKES A LOT OF ENERGY.  YOU CAN'T DO

[8] IT IF YOUR BRAIN ISN'T WORKING.  SO I JUST CAN'T -- I

[9] DON'T SEE ANY EVIDENCE OF MALINGERING IN DECLAN.

[10]      Q.   SO YOU CAN'T FAKE A BRAIN INJURY IF YOU'RE

[11] BRAIN-INJURED?

[12]      A.   RIGHT.  IF YOU HAVE REAL EVIDENCE OF BRAIN

[13] INJURY, IT'S AWFUL HARD TO FAKE IT.

[14]      MS. LOUCKS:  I THINK THAT'S ALL I HAVE.  THANK

[15] YOU, DOCTOR.

[16]

[17]                 EXAMINATION

[18]

[19] BY MR. MUSSLER:

[20]      Q.   IN A REAR-END COLLISION, THE HEAD OFTEN

[21] GOES THROUGH AN ACCELERATION/DECELERATION RANGE OF

[22] MOTION, RIGHT?

[23]      A.   YES.

[24]      Q.   AND THAT CAN CAUSE THE DIFFUSE AXONAL

[25] INJURY WITHOUT THE HEAD STRIKING A SOLID OBJECT?

Page 60

[1]      A.   ABSOLUTELY.  ALL THE EXPERIMENTAL MODELS

[2] WITH MONKEYS WERE DONE IN MONKEYS WHERE THEY -- THEY

[3] NEVER HIT ANYTHING.  ALL THEY DID WAS LITERALLY FLEX

[4] THE HEAD FORWARD RAPIDLY, AND THEY PRODUCED DIFFUSE

[5] AXONAL INJURIES, INTRACRANIAL HEMORRHAGES AND

[6] EVERYTHING.  THEY WOULD ACTUALLY, LITERALLY ENCASE THE

[7] MONKEY'S HEAD IN PLASTICINE AND JUST FLEX IT FORWARD

[8] VERY QUICKLY.

[9]      Q.   THAT WAS A NEUROSURGEON UP EAST THAT DID

[10] THAT --

[11]      A.   TOM GENNARELLI DID THAT.

[12]      Q.   GENNARELLI, BECAUSE I TOOK HIS DEPOSITION.

[13] AND THEN THE F.D.A. MADE HIM QUIT DOING IT.

[14]      A.   WELL, IT'S A COMPLICATED PROCESS.

[15]      Q.   WHEN YOU HAVE A DIFFICULT AXONAL INJURY

[16] LIKE HE'S GOT, THAT'S NOT GOING TO SHOW UP ON A C.T.,

[17] M.R.I. OR AN X-RAY?

[18]      A.   IT CAN SHOW UP BETWEEN THE SECOND AND SIXTH

[19] WEEK AFTER THE INJURY FOR A SHORT TIME WITH

[20] ENHANCEMENT, BUT IF YOU MISS IT, THEN IT'S ALMOST

[21] IMPOSSIBLE TO DETECT IT.

[22]      Q.   CURRENTLY HE'S ON A DRUG FOR HIS GROWTH

[23] HORMONE THAT DR. CYRUS PRESCRIBED FOR HIM.  DO YOU KNOW

[24] WHAT THAT DRUG COSTS?

[25]      A.   WELL, I HAVE A LETTER IN MY FILE FROM

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

---

Page 61

[1]   PRECISION PRESCRIPTION THAT LISTS HIS COST OF HIS
[2]   MEDICINES.
[3]       Q.    AT WHAT?
[4]       A.    THE GROWTH HORMONE IS ABOUT $1,642 A MONTH.
[5]   THE OTHER MEDICINES, THE CYTOMEL AND THINGS LIKE THAT,
[6]   THAT USUALLY RUNS ABOUT $100, $150 A MONTH.  THAT'S NOT
[7]   IN THIS LETTER.  WE'RE TALKING, BETWEEN THE GROWTH
[8]   HORMONE AND ALL HIS OTHER MEDICINES, PROBABLY SOMEWHERE
[9]   ON THE ORDER OF $3,000 A MONTH AT A MINIMUM.
[10]          NAMENDA RUNS ABOUT $300 OR $400 A MONTH BY
[11]  ITSELF, AND TESTOSTERONE IS ALSO AT LEAST A COUPLE,
[12]  THREE HUNDRED DOLLARS A MONTH, DEPENDING UPON WHETHER
[13]  YOU GIVE IT ON A.M. OR -- THERE ARE SOME LOTIONS THAT
[14]  YOU CAN PUT ON, SOME SALVES YOU CAN PUT ON THAT ARE
[15]  CHEAPER.
[16]      MR. MUSSLER:  THAT'S ALL I HAVE.
[17]
[18]              CONTINUING EXAMINATION
[19]
[20]  BY MS. LOUCKS:
[21]      Q.    ONE MORE QUESTION.  THE TRIAL OF THIS CASE
[22]  IS AUGUST 14 THROUGH 25.  WE HAVE BEEN INFORMED BY
[23]  MR. MUSSLER THAT YOU ARE GOING TO BE APPEARING LIVE.
[24]  IS THAT YOUR UNDERSTANDING?
[25]      A.    YES.

---

Page 62

[1]       MS. LOUCKS:  THAT'S ALL I HAVE.
[2]       THE WITNESS:  THANK YOU.
[3]       (DEPOSITION ADJOURNED AT APPROXIMATELY 6:30 P.M.)
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 63

[1]   STATE OF KENTUCKY   )
[2]                      ) ss
[3]   COUNTY OF JEFFERSON )
[4]          I, ERIC J. SOERGEL, A NOTARY PUBLIC, WITHIN
[5]   AND FOR THE STATE AT LARGE, DO HEREBY CERTIFY THAT THE
[6]   FOREGOING DEPOSITION OF
[7]              DAVID G. CHANGARIS, M.D.
[8]   WAS TAKEN BEFORE ME AT THE TIME AND PLACE AND FOR THE
[9]   PURPOSE IN THE CAPTION STATED; THAT THE WITNESS WAS
[10]  FIRST DULY SWORN TO TELL THE TRUTH AND NOTHING BUT THE
[11]  TRUTH; THAT THE DEPOSITION WAS REDUCED TO SHORTHAND
[12]  WRITING BY ME IN THE PRESENCE OF THE WITNESS; THAT THE
[13]  FOREGOING IS A FULL, TRUE AND CORRECT TRANSCRIPT OF THE
[14]  SAID DEPOSITION SO GIVEN; THAT THERE WAS NO REQUEST
[15]  THAT THE WITNESS READ AND SIGN THE DEPOSITION; THAT THE
[16]  APPEARANCES WERE AS STATED IN THE CAPTION.
[17]         I FURTHER CERTIFY THAT I AM NEITHER OF COUNSEL
[18]  NOR OF KIN TO ANY OR ALL OF THE PARTIES TO THIS ACTION,
[19]  AND AM IN NO WISE INTERESTED IN THE OUTCOME OF SAID
[20]  ACTION.
[21]         WITNESS MY SIGNATURE THIS 29TH DAY OF JULY, 2006.
[22]
[23]                    _____
[24]                    NOTARY PUBLIC
                        STATE AT LARGE, KENTUCKY
[24]
      MY COMMISSION EXPIRES:  OCTOBER 29, 2007
[25]

---

Page 64

[1]   STATE OF _____)
[2]   COUNTY OF _____)
[3]          I, DAVID G. CHANGARIS, M.D., DO HEREBY CERTIFY
      THAT I HAVE READ THE FOREGOING DEPOSITION CONSISTING OF
[4]   THE FOREGOING PAGES, AND THAT THE ANSWERS AND
      INFORMATION CONTAINED THEREIN ARE TRUE AND CORRECT TO
[5]   THE BEST OF MY KNOWLEDGE AND BELIEF WITH THE EXCEPTION
      OF THE FOLLOWING CORRECTIONS AND CHANGES LISTED BELOW
[6]   OR IN AN ADDENDUM ANNEXED HERETO, IF ANY:
[7]   PAGE NO. LINE NO. CORRECTION
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]              _____
[20]              DAVID G. CHANGARIS, M.D.
      STATE OF _____)
      COUNTY OF _____)
[21]
                 SIGNED AND SWORN TO BEFORE ME THIS
[22]  _____ DAY OF _____, _____.
[23]             MY COMMISSION EXPIRES:
[24]
                 _____
[25]             NOTARY PUBLIC
                 STATE OF

---

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

**S**

$1,642 61:4
$100 61:6
$150 61:6
$2,000 20:10
$3,000 23:3;61:9
$300 61:10
$400 61:10
$5,000 23:13
$500 20:2

**1**

1 4:22
10 5:21;11:6;12:4,11;
32:25;40:6;52:8
100 46:7
14 23:15;31:8;39:19;61:22
15 50:22
1984 12:14
1985 6:14
1990 5:18
1997 5:10

**2**

2 28:23
20 12:4,12;14:20;46:24;
52:8
2003 4:12;35:2
2004 51:3
2005 23:15;31:8;38:4;
39:19;54:11
2006 20:9;51:6
22 51:6
23 4:12;20:9
25 61:22
29 45:15;46:1,9

**3**

30 6:4;49:15,23
35 50:3

**4**

4 35:2
40 6:4;49:23;50:3
40-YEAR-OLD 50:3
45 49:15;50:21

**5**

50 14:19

**6**

6:30 62:3

**7**

**70** 14:18;41:16

**8**

**80** 10:1
**86** 6:14

**9**

**90** 9:11,21;10:1;14:17;
16:25

**A**

ABILITY 14:23;15:22;
45:2,5,6,6;47:16;59:2
ABLE 45:11;56:19
ABNORMAL 7:4;58:8
ABSOLUTELY 21:25;
49:4;60:1
ACADEMIC 6:25;8:14;
20:18,22;54:20
ACADEMICALLY 21:14,
19;58:10
ACADEMICIAN 8:11
ACADEMICS 7:12
ACCELERATED 15:1
ACCELERATES 14:11
ACCELERATING 14:12
ACCELERATION/DECELERA
TION
31:24;59:21
ACCESS 8:17
ACCIDENT 4:11;10:19;
14:13;17:25;18:2;27:12,16,
20,21;31:10;32:3;33:10,16;
38:19,22,25;43:15,16,25;
44:6,7,9,19,20;48:16;
50:25;52:25;55:4,9;56:12
ACCIDENTS 8:23;9:12,
24;26:24
ACCURATE 52:16
ACTIVELY 9:19;10:23
ACTIVITIES 11:4;45:1
ACTIVITY 8:25
ACTUAL 33:5
ACTUALLY 6:13;7:8;
10:23;16:22;19:3;25:1;
28:14;29:17;38:1,12;60:6
ACUITY 38:17
ADAPTIVE 47:16
ADDRESSED 38:15;
52:17
ADEQUATE 8:12
ADHERENCE 20:22
ADJAMENT 22:25
ADJOURNED 62:3
ADRENAL 58:17
ADRENALS 16:10
ADVERTISES 38:2,3
ADVISOR 18:8
AFFECT 32:10
AFFECTED 30:18;38:20
AFFECTIONALLY 10:2

AFFIRMED 4:2
AFFORD 8:12,16
AFRAID 40:25
AFTERNOON 4:8
AGAIN 30:14;31:5,19;
44:17;54:19
AGE 14:12;15:4;40:4
AGGRESSIVE 16:22
AGO 22:20;38:14;45:18;
54:14
AGREED 21:9
AGREEMENT 29:16
AHEAD 19:11;21:18
AHOLD 22:10
AID 53:17
ALLEGEDLY 48:24
ALLOW 22:16
ALLOWED 22:17
ALMOST 50:22;60:20
ALONG 8:20;32:4;52:21
ALTERCATION 56:10
ALTOBELLIS 35:23
ALTOGETHER 23:10
ALWAYS 6:4;7:13,15;
18:5;40:11;57:5
ALZHEIMER'S 13:19,22,
24;14:2,6,10;15:2,4;53:25;
54:1,14,18,22,24
ALZHEIMER'S-LIKE
13:15
AMOUNT 10:24;17:15;
18:17,18
ANALYSES 23:11
ANALYSIS 44:24;45:25;
56:16
AND/OR 23:23
AND-A-HALF 43:23;
45:18
ANESTHESIOLOGIST
5:14;36:1
ANESTHESIOLOGISTS
5:21
ANESTHESIOLOGY
5:18
ANGRY 55:25,25
ANSWERED 55:14,16
ANTAGONIST 53:24,24
ANXIETY 44:15,17
ANYMORE 9:9;46:7
APART 29:25
APPARENT 47:12
APPARENTLY 27:19
APPEARING 61:23
APPROACH 5:23;21:10
APPROACHES 36:5
APPROPRIATE 15:4;
25:7;40:4,11
APPROVAL 22:12
APPROXIMATELY 62:3
AREA 11:15;31:17;37:6;
38:16;49:7,18;58:19
ARGUE 58:10

ARGUING 57:3
AROUND 32:11;43:24;
44:18
ASIDE 56:21
ASPECT 5:12
ASSESS 38:8
ASSOCIATE 54:23
ASSUMING 48:2,6
ATTENTION 14:4
ATTENTIONAL 13:13;
19:9
ATTORNEY 4:9
AUGUST 61:22
AUNT 14:5,7,8
AVERAGE 11:9;14:5;
55:11
AWARD 6:11
AWARE 8:22;12:17;
20:12;26:25;27:2,3,10,17;
36:9;37:19;43:17;46:8;
47:10
AWAY 9:16
AWFUL 59:13
AXONAL 59:24;60:5,15

**B**

BABIES 16:21
BABY 16:21,21,23
BACK 6:13,21;9:25;
15:15,16;16:14;23:15;
26:17;35:3,5;38:4;39:18;
47:2;49:12;54:11
BACKGROUND 7:7
BACKS 10:8
BACKUP 52:13
BAD 53:5,13
BAR 16:20;17:3,4
BASED 8:8;32:6;39:11;
45:21,25
BASICALLY 5:20;9:3,25;
20:6;23:17;24:6;27:2;
31:16,21;35:7;46:2
BASIS 22:6;29:2
BATON 56:18
BEAT 7:13
BECAME 22:20;27:10;
43:17
BECOME 8:22;14:23;
37:19;47:12,17;49:16
BEGINNING 23:3;52:22
BEHALF 4:1;11:25
BEHAVIORS 47:16;
54:15
BELT 31:16
BENDING 47:1
BERNARD 33:24;34:1;
35:2
BEST 15:10;53:3
BETTER 8:7;14:3;37:4
BIGGEST 39:12
BILATERALLY 41:23
BILLED 20:9

BIRTHDAYS 47:23
BIT 12:24;17:13,14;20:24;
30:12;34:20;51:8;54:14
BLACK 56:18
BLANK 50:20
BLEEDING 39:14
BLEND 8:10
BLOOD 15:18,25;16:12
BOARD 5:4
BODIES 49:21
BODY 16:9;49:17
BOTH 15:8
BOTTOM 41:20,25
BRAIN 6:21,22;14:11;
15:12,14,18,21;16:7,7,10,
14;18:2;31:23;33:5;34:17;
36:11,14;40:14;45:16;
46:10;47:9,13,15;49:1;
50:20;51:22,25;52:6,9;
54:17;55:1,6;57:15,16;
58:4,21;59:1,8,10,12
BRAIN-INJURED 32:5,
12;57:12,14;59:2,11
BRAND 5:22
BREAKS 47:4
BRIEF 4:20
BRIGHT 32:15,16,21
BRING 27:14
BROKEN 10:7,8;39:15
BROUGHT 4:10;42:8
BUNCH 8:7
BURN 53:14
BURNING 53:12
BUSINESS 5:22,25,25;
12:5,15

**C**

CALL 8:12;10:3;24:11,12;
29:12;50:1
CALLED 4:1;14:22;16:20;
22:11;46:24;51:10
CALLS 22:17
CAME 12:22;19:21;46:1
CAN 8:6,7;13:5,25;16:19;
18:22,23;25:17;32:13,25;
36:12;37:16;38:9,10;41:16;
43:1,10;48:25;52:1;54:16;
58:9,13;59:24;60:18;61:14,
14
CAPACITY 14:15,16
CAR 10:19;18:2
CARE 18:18;19:5;30:24,
25;51:11,19
CAREER 46:8
CAREFUL 48:11
CAROLINA 10:5
CASE 7:3;20:12;25:23;
26:1,9,10,19;30:3,11;61:21
CASES 29:15
CASH 45:12,13
CASSARO 13:9;18:17,
20,21;29:8;35:21,24;36:11

CATCH 57:19
CAUSE 17:4;49:2,3,6;
59:24
CAUSED 38:25;54:25
CAUSING 15:4
CENTERS 10:6
CEREBRI 15:11,12
CERTAIN 6:21;10:14;
14:16,18,19;20:22;43:5;
49:2,2,3
CERTAINLY 20:25;
23:25;30:5;37:11;46:16
CERTIFIED 5:4
CHANCE 30:11;35:17
CHANGARIS 4:1,8,14
CHANGARIS' 25:14
CHANGE 27:11;47:4;
48:1;54:16
CHANGED 6:3;47:8;
52:18
CHANGES 5:17;38:17,17
CHARGED 19:25;20:2;
23:3,9
CHARMING 46:17
CHEAP 52:1
CHEAPER 61:15
CHECK 23:18
CHECKED 22:1,2,2,3
CHEMICAL 6:20;54:16;
57:16,21
CHEMICALS 16:8,8;
21:11
CHEST 31:17,19
CHOOSE 32:19
CLARK 33:24
CLASSIC 54:21
CLASSIFICATION 47:5
CLEANER 28:3
CLEAR 17:24;18:8;20:5;
36:8;40:2;44:1;47:9;58:3
CLEARLY 53:17
CLEARS 21:22
CLIENT 47:3
CLIMBING 46:25
CLINICAL 6:10;14:2;37:8
CLINICALLY 21:14
CLUB 10:3
COACHING 30:15,20
COGENT 27:5
COGNITIVE 27:17;43:13
COHERENT 39:24
COLLEAGUES 9:18
COLLISION 59:20
COMMENTS 55:13
COMMON 38:17;55:12
COMMONLY 14:22
COMMOTIO 15:11,12
COMMOTION 15:13
COMMUNICATIONS
25:10,21
COMPANIES 50:12
COMPENSATE 57:4
COMPENSATION 56:25

COMPLAIN 31:18,18
COMPLAINS 38:6
COMPLETE 24:18;30:1
COMPLEX 16:7,12
COMPLICATED 21:11;
49:1;60:14
COMPONENTS 43:18
COMPRISED 6:4
COMPROMISED 15:24
CONCENTRATING
42:13,20;54:6
CONCENTRATION
42:19
CONCERNED 13:12
CONCERT 46:6,7
CONCLUSION 42:9
CONCUSS 34:10
CONCUSSION 34:13,21
CONCUSSIVE 34:11
CONDITION 29:19;51:13
CONDUITS 16:7
CONNECTION 36:10,12,
14
CONNECTIONS 16:6
CONS 26:16
CONSCIOUS 12:17
CONSIDER 30:16;58:8
CONSIDERATION
56:14,20
CONSIDERED 13:6;
34:11
CONSISTENT 54:7;
57:17,18
CONSISTENTLY 57:13
CONSTANT 33:18,21
CONSTITUTES 12:4;
52:7
CONSULTANT 13:1
CONSULTED 29:17
CONSULTING 18:3
CONTACT 13:8
CONTINUING 61:18
CONTROL 16:23
CONTROLS 16:10
CONVERSATION 29:1,
6,6
COPY 51:7
CORD 10:6
CORROBORATED
27:24;43:9
COSMETIC 50:9,10
COST 22:24;52:2;61:1
COSTLY 30:9
COSTS 60:24
COUNSELING 50:15
COUPLE 19:8,15;22:2,3;
37:22;61:11
COURSE 31:4;48:15;55:5
COURT 10:25;11:4;12:2;
25:17
COVER 50:12
CRAWLING 46:25
CREATED 5:25

CRITERIA 20:22;21:3;
32:4
CRYING 16:24
CT 60:16
CURIOUS 20:12
CURRENT 6:14;27:12;
40:3
CURRENTLY 5:7;60:22
CURVE 36:15
CUSTOMER 47:17
CUTTING 9:19
CV 4:17
CYRUS 7:17,18,24;8:10,
21;21:5,7,18;22:18;24:6,7,
11,12;28:18;29:2,7;35:21;
60:23
CYRUS' 21:9
CYTOMEL 61:5

### D

DAILY 45:1
DAMAGE 34:17
DATE 28:6
DAVID 4:1,14
DAY 19:5;45:11;50:25;
51:3;54:8
DAY-TO-DAY 18:18
DEAL 7:21;32:16;39:16;
46:11
DEALING 7:22
DEAR 56:9
DEBATED 50:11
DECELERATION 15:15;
17:9,15
DECIDED 5:11
DECIMAL 32:25
DECLAN 4:11;7:4;14:25;
15:20;17:2;21:20,20;27:25;
29:7;59:9
DECLAN'S 51:11
DECODE 45:6
DEEP 29:13
DEFENDANT 4:2
DEFENSE 12:1,2,3
DEFENSIBLE 27:6
DEFICIENCY 20:16,20,
23;21:2;49:11
DEFICITS 52:20
DEFINE 57:4
DEFINES 20:22
DEFINITION 20:19
DEGENERATIVE 55:1
DEGREE 47:11;50:6
DELIVER 30:24
DELIVERED 21:12
DEMANDING 21:4
DEMENT 14:14;55:11
DEMENTED 14:23
DEMENTIA 15:1
DEMENTING 14:22;15:1,
3,7;55:3
DEPENDING 61:12

DEPENDS 34:24
DEPLETES 49:24
DEPOSITION 4:22;
20:10,11;23:6;24:24;25:24;
26:2,19;28:22,23;60:12;
62:3
DEPOSITIONS 11:8
DEPRESSED 43:15
DEPRESSION 42:8,14;
43:18;44:4,13
DESIRABLE 50:7
DESTROYED 58:21
DESTRUCTION 16:3
DETAIL 14:4
DETECT 60:21
DETERMINE 57:11
DEVELOP 43:11
DEVELOPED 5:10
DEVELOPMENT 6:11
DIAGNOSED 7:9;33:25
DIAGNOSES 35:21
DIAGNOSIS 31:25,25;
54:18
DIAGNOSTIC 13:11;
30:15
DIFFERENCE 46:9
DIFFERENT 5:16;13:7;
35:13;43:7,18,20;51:24;
52:3;58:25
DIFFERENTLY 18:19
DIFFICULT 38:7;60:15
DIFFICULTIES 44:20
DIFFICULTY 42:12,22,24
DIFFUSE 59:24;60:4
DIPLOPIA 40:23,24
DIRECT 29:6
DIRECTION 42:4
DISABILITY 46:3;52:14
DISABLED 46:8,10,13;
51:13
DISCOVERING 49:19
DISCUSS 13:9;25:23;
26:1;38:10
DISCUSSING 48:11
DISEASE 5:11;13:20,24;
14:3,6,10;15:2,4;36:22;
53:25;54:22,24;55:1
DISORDERED 36:19;
58:11,24
DISORIENTED 33:9
DISTRACTED 39:11
DISTRESSED 18:6
DOC 53:13
DOCKED 45:8,10
DOCTOR 4:15;7:8;13:10;
27:22;34:5;35:24;59:15
DOCTOR/PATIENT
18:4,12
DOCTORS 30:13;32:1;
35:11,13,19
DOCUMENT 8:8;28:8,21;
53:2,3
DOCUMENTATION

8:13;20:16;22:12;38:9
DOCUMENTED 48:3
DOCUMENTS 26:12,14;
31:5,14
DOLLAR 8:16,17
DOLLARS 61:12
DOLLAR-WISE 5:24
DONE 5:19;16:11;19:18;
21:9;24;24:13;30:3;37:12;
45:22;51:18;60:2
DOOR 9:23
DOUBLE 22:7,19;40:24;
41:3
DOUBLECHECK 25:13;
31:6
DOUBLECHECKED
22:8
DOVETAILED 57:10
DOWN 14:20;15:25;
22:14;42:1;43:3;45:8,10;
53:12,14
DR 4:8;7:17,18,24;8:10,
21;18:17,20,21;20:21;21:5,
7,9,9,18;22:18;24:6,7;
25:14;28:18;29:2,7,8;
33:24;34:1;35:2,23,24;
36:11;60:23
DRINK 17:2
DROPPING 49:17
DROPS 50:6
DRUG 60:22,24
DULY 4:2,22
DURING 23:17
DUTY 47:6
DYSFUNCTION 48:4
DYSTONIA 5:10

### E

EARLIER 48:18;54:2
EARLY 18:9;24:5
EAST 60:9
EFFECT 20:8;37:19
EFFECTIVELY 52:2
EFFECTS 37:3;48:19
EGGS 56:9
EIGHT 58:18
EITHER 8:6;13:8;19:6
ELSE 7:13;23:2;30:17
EMPIRICALLY 8:6
EMPTY 16:4
ENCASE 60:6
ENCOUNTER 8:3,4
ENCOUNTERED 56:3
END 10:23;17:5;42:13;
45:15;46:2;50:15
ENDOCRINE 22:21;36:7,
9,22,23;37:3,13,15;38:1,2;
40:15
ENDOCRINOLOGIST
36:2,4;37:1,7
ENDOCRINOLOGISTS
37:5

**ENDOCRINOLOGY** 36:5,25
**ENERGY** 59:7
**ENGAGED** 8:25;18:16
**ENHANCEMENT** 60:20
**ENJOY** 8:11
**ENORMOUS** 18:18
**ENOUGH** 28:19;30:8; 32:11;33:3;53:5
**ENTIRE** 37:2
**ESOPHORIA** 40:23;41:1
**ESOTROPIA** 40:23,25
**ESPECIALLY** 6:24
**ESSENTIALLY** 47:24
**ESTABLISHED** 22:21
**ESTIMATE** 45:20
**EVAL** 11:23;20:7
**EVALUATED** 9:2;39:18; 46:22;47:12
**EVALUATING** 26:13
**EVALUATION** 30:21; 45:22
**EVALUATIONS** 31:4; 44:13
**EVEN** 6:5;12:17,17;17:24; 27:17;56:20
**EVENT** 34:11
**EVENTS** 22:23;40:3
**EVERYBODY** 14:3,17; 30:17;38:6
**EVERYONE** 7:20
**EVIDENCE** 40:23;57:15, 16,21;58:4;59:1,9,12
**EVOLVED** 22:19
**EXACT** 38:13
**EXACTLY** 10:18;15:6; 22:17;25:4;30:17;31:6; 43:17;45:4
**EXAM** 39:22;40:13,17; 42:5
**EXAMINATION** 4:5; 39:20;59:17;61:18
**EXAMINED** 4:3
**EXAMPLES** 42:21,25
**EXAMS** 11:5;20:4
**EXCITABLE** 48:12,13
**EXCITEMENT** 37:15
**EXCLUSION** 39:14
**EXECUTIVE** 14:4;45:2,4, 7;47:11;55:17
**EXHIBIT** 4:22;28:20,23
**EXPECT** 39:7;40:17
**EXPENSE** 21:20
**EXPENSIVE** 52:1
**EXPERIENCES** 35:3
**EXPERIENCING** 33:16
**EXPERIMENTAL** 60:1
**EXPLORE** 17:23
**EXPLORED** 17:25
**EXPRESS** 38:5;43:20
**EXTENSIVE** 13:24;22:4; 30:9,16
**EXTENSIVELY** 6:9;15:8

**EXTERNAL** 54:15
**EXTRA** 28:21
**EYE** 41:2
**EYES** 41:3

**F**

**FACED** 8:5
**FACILITATE** 24:8
**FACT** 12:14;14:9;38:18; 39:14;48:3;49:10
**FACTORS** 36:17
**FAIRLY** 29:2;32:21
**FAKE** 57:13;59:10,13
**FALL** 6:6
**FALLING** 16:19;17:4
**FAMILIAR** 35:22
**FAMILY** 43:21
**FANCIES** 36:3
**FAR** 12:11;23:10;41:18; 53:9
**FAST** 15:16;16:16,17
**FASTER** 15:3;55:3
**FDA** 22:2,8,12;60:13
**FEEL** 19:2;50:4;57:5
**FEELING** 28:13;39:11
**FEET** 30:10;41:25
**FELL** 17:2
**FELLOW** 46:15
**FELT** 19:4;20:24
**FEW** 12:22
**FIELD** 38:16
**FIELDS** 40:22
**FIGURE** 21:6;47:19,21
**FIGURED** 21:7
**FILE** 24:14,16,18;25:23; 26:1,7;28:4;29:23,24;60:25
**FINALLY** 49:20;53:16
**FINE** 41:4,11;53:7
**FINGER** 46:5
**FIRST** 4:2;7:6,11,12,13, 16,16;18:14;19:21;54:9
**FIT** 9:5
**FITTING** 56:8
**FIVE** 10:22;13:6,9,18; 22:20
**FIX** 7:3
**FLAT** 32:10
**FLEX** 60:3,7
**FLEXION** 41:22,23
**FLUENT** 35:21
**FOCUS** 7:6;48:10
**FOCUSING** 54:7;56:7
**FOLKS** 57:3
**FOLLOWING** 4:21
**FOLLOWS** 4:3
**FOOT** 39:15
**FOOTWORK** 20:14
**FORENSIC** 9:10
**FORGETTING** 53:10
**FORK** 33:2
**FORTH** 15:15,17;16:14
**FORWARD** 8:8,13;18:25;

19:13;60:4,7
**FORWARDED** 28:24
**FOUNDATION** 58:22
**FOUR** 10:6,8;11:13; 13:18;22:20;31:3
**FOUR-SYLLABLE** 32:21
**FRANKLY** 38:18
**FRAZIER** 51:23
**FREQUENTLY** 13:16
**FRONT** 31:16
**FRUSTRATED** 56:2,7
**FRUSTRATION** 43:20
**FULFILL** 21:3
**FULL** 4:13
**FULLY** 26:25;47:10
**FUNCTION** 43:13;48:6
**FUNCTIONING** 14:4,21; 32:4;36:9;37:16,21;45:3,4, 47:11,18;55:17;57:16;58:4, 17,17,22,24
**FUNCTIONINGS** 58:18
**FUNCTIONS** 44:25;45:7
**FUNDAMENTAL** 22:11

**G**

**GAIN** 36:20;48:20,24; 49:2,6,11;56:15,17,19,24, 25;57:6,7,10
**GAINED** 50:3
**GAPS** 27:4,7,8
**GAVE** 23:25;39:19;46:23
**GENERAL** 22:3;26:11; 45:8;47:5
**GENNARELLI** 60:11,12
**GERMAN** 15:11
**GERMANS** 15:10
**GETS** 8:7;37:14;57:9
**GIGGED** 58:19
**GIVEN** 38:18;59:1
**GLAND** 16:1
**GLOBAL** 49:3
**GOES** 15:14;22:12;53:9; 55:10;59:21
**GOLD** 21:10;22:7,20
**GOOD** 4:8;27:10;30:12; 38:23;45:11;46:19;55:8; 58:12
**GRASP** 40:3
**GREAT** 15:16;41:6;50:19
**GREATEST** 18:21
**GROSSLY** 40:5,22
**GROWTH** 20:16,20;21:2; 22:23;24:5;26:11,15;36:17; 49:5,10,12,14,17,23;50:8; 57:22;58:5,16;60:23;61:4,7
**GUARANTEE** 30:1
**GUESS** 10:22;18:14
**GUN** 10:3
**GUY** 16:19;46:17

**H**

**HALLMARK** 15:2
**HAMILTON** 42:11
**HAMMER** 34:9
**HANDLE** 14:24;32:11; 45:6;47:17,17,19
**HANDLED** 10:4,7;31:6,7
**HAPPEN** 16:19;17:17
**HAPPENED** 14:25;15:6, 20;19:14;37:22,24;53:15
**HAPPENS** 15:14;24:10; 45:3;50:2;56:5
**HAPPY** 47:22
**HARD** 7:15;10:18;18:13; 29:25;38:11;48:13;57:7,11, 18;59:13
**HARDER** 34:19,20
**HEAD** 6:9,17;10:4;15:6,9, 11;17:3,7,10,11,13,14,18, 22;32:18;34:10,14;39:23; 45:3;59:20,25;60:4,7
**HEADACHES** 33:16,17; 35:4,6;39:12
**HEAD-INJURED** 39:10, 16;51:18,19
**HEALTH** 6:10;10:16; 30:24,25
**HEAR** 40:9
**HEARD** 4:21
**HEIGHTS** 46:25
**HELP** 19:14;34:22,24; 35:1;37:16,20;51:8
**HELPED** 21:5
**HEMORRHAGE** 16:3
**HEMORRHAGES** 60:5
**HERE'S** 51:7
**HIGH** 16:25
**HIGHER** 45:21
**HIGH-FUNCTIONING** 45:1
**HIGH-LEVEL** 47:18
**HIGHLY** 38:8;58:9
**HIMSELF** 36:3
**HIRE** 45:13
**HISTORY** 9:3;21:15;44:2
**HIT** 12:10;17:3,7,18,22; 34:9,18;60:3
**HITS** 6:16;34:10
**HITTING** 49:24
**HOPE** 29:24
**HORMONAL** 20:23
**HORMONE** 20:16,20; 21:2;22:23;24:5;26:11,15; 49:5,11,12,14,17,24;50:8; 57:22;58:5,16;60:23;61:4,8
**HOT** 22:24;49:18;54:20
**HOTLY** 50:11
**HOUR** 17:1;47:4;50:21
**HOURS** 11:3
**HOUSE** 53:12,14
**HUNDRED** 12:10,11; 61:12
**HURT** 7:2;9:12;10:22
**HYPERTENSION** 6:15

**HYPOTHALAMUS** 58:14

**I**

**IDEA** 17:21
**IDEATION** 39:24
**IDENTIFICATION** 4:23
**IME** 12:4
**IME'S** 12:3
**IMMEDIATELY** 33:9
**IMPACT** 17:17;37:8
**IMPAIRMENT** 31:3; 45:15,16,22;46:3,5,10
**IMPLANTS** 9:16
**IMPORTANT** 17:12; 22:25
**IMPOSSIBLE** 60:21
**IMPRESSION** 42:7
**IMPROVE** 37:21
**IMPROVED** 28:3
**IMPULSE** 16:23
**INAPPROPRIATE** 40:10
**INCIDENTAL** 10:12
**INCLUDE** 47:6
**INCOME** 9:11;11:2,3
**INCONSISTENCIES** 57:19
**INCORPORATED** 4:10
**INCREASED** 15:7
**INCREASING** 44:19
**INCREDIBLE** 17:15
**INDEPENDENT** 11:5,23; 20:4,7
**INDEX** 46:5
**INDICATING** 34:15
**INFORMATION** 14:24; 22:15;26:15;27:3,7,9; 32:11;45:19,22;52:16
**INFORMATIONAL** 27:4
**INFORMED** 61:22
**INITIAL** 27:18
**INITIALLY** 47:12
**INJECTIONS** 9:14
**INJURIES** 10:4;15:23; 27:9,14;31:15,16;49:2,3,4; 51:22;52:9;60:5
**INJURY** 6:9,17;10:6; 14:11;15:9,11,15;17:15,16; 18:2;31:24;40:14;43:12; 45:3,17;47:10,13,15;48:24; 49:1;52:6;55:6;57:3;58:21; 59:1,10,13,25;60:15,19
**INPUT** 30:14
**INSIDE** 15:17
**INSTEAD** 32:20
**INSTITUTES** 6:10
**INSUFFICIENCY** 9:6,6; 39:1
**INSULIN-LIKE** 36:17
**INSURANCE** 10:14,15, 16,17;50:11,12
**INTACT** 40:5,22
**INTELLIGENT** 59:5

INTENSIVE 51:25
INTENT 45:6
INTENTIONAL 59:7
INTERACTION 58:24
INTERACTIONS 49:21
INTEREST 6:23;36:5;
52:6
INTERESTING 39:16;
49:20
INTERFACES 36:7
INTER-RELATIONSHIP
36:24
INTERVENTIONAL 5:23
INTERVENTIONS 9:14
INTERVIEW 42:10;43:11
INTO 5:21;22:16,17;
28:22;56:14,20
INTRACRANIAL 6:15;
60:5
INTRODUCE 28:22
INVESTIGATIVE 6:10
INVOLVED 8:23;10:2,18;
16:24;27:19,21;31:19
INVOLVING 21:11
IRATE 47:17
ISSUE 50:11
ISSUES 18:24;26:11;
56:15

**J**

JOB 47:5;50:25
JOB-RELATED 43:22
JOBS 47:18
JOKE 32:17
JULY 23:15;31:8;39:18
JUNE 23:4;51:5,5,10
JUSTIFY 43:8

**K**

KEEP 30:25;35:15;49:4
KEEPING 12:9
KEPT 24:21;35:12
KILLED 16:22
KIND 4:15;20:18;28:19;
30:8;32:21;34:5;35:5,24;
40:14;41:14;45:8;50:12;
54:16;56:4
KINDS 18:25;20:17;26:21
KNEW 7:19
KNIFE 10:3
KNOCKED 38:19,22
KNOWLEDGEABLE
58:12
KNOWN 49:6

**L**

LAB 8:7,9
LABORED 40:3
LANDING 17:5
LANGUAGE 15:11;46:11

LAPSES 32:18
LARGE 9:19;18:16;52:7,7
LARGEST 5:24
LAST 5:20;11:2;12:9;
13:17;19:7,15;23:16
LATE 13:12;45:23
LATER 20:9;28:25;42:7;
53:10
LATEST 28:17
LATIN 15:17
LAUGH 33:3
LAWSUIT 4:10
LAWYER 25:8,11,14
LEAF 30:7
LEARN 37:23
LEARNED 7:11
LEARNING 36:15
LEAST 61:11
LEAVING 53:11
LED 54:17
LEGAL 31:4
LESS 11:3,6;12:10,11;
46:24
LETTER 51:5,7,10;52:12,
17;60:25;61:7
LETTERS 25:5,18;29:21,
22
LEVEL 13:25;22:4;26:16;
46:7
LIFE 6:23;9:25;22:25;
43:20
LIFTING 46:24
LIGHT 7:6;47:6
LIKEABLE 46:15,19
LIKELY 47:7
LIKES 37:13;38:3
LIMITED 31:1;46:23
LIMITING 47:18
LIST 33:19
LISTS 61:1
LITERALLY 58:20;60:3,6
LITIGATION 9:22,22;
10:10,11,12,19,24;11:4
LITIGATION-TYPE 9:10
LITTLE 17:13;14:20:24;
30:3;42:6;45:19;51:8;
54:14
LIVE 61:23
LIVING 45:1
LOGICAL 58:23
LONG 31:7;38:9;52:2
LONGER 51:17
LOOK 13:7;14:10;24:11,
16;32:9;33:4;35:17;58:13
LOOKED 6:22;11:2;
26:10;31:21;32:8
LOOKS 16:4;18:1;50:4
LORD 38:23
LOSE 14:14,15,21,23;
46:5;48:25
LOSS 14:3,4;47:11;49:3,
13;57:6,7
LOST 15:22;16:6;45:2;

49:13
LOT 8:23;13:11;22:22,23;
35:1;43:6;45:19;50:8;
51:19;52:3;59:7
LOTIONS 61:13
LOTS 6:12,16;26:6
LOUCKS 4:7,9,25;25:15;
28:20;40:1;59:14;61:20;
62:1
LOUISVILLE 12:13
LOVE 6:18
LOVELY 4:18
LOW 46:2
LOWER 47:2

**M**

MACROPATHOLOGY
15:9
MACRO-PERSPECTIVE
31:22
MAGIC 56:18
MAIL 28:17
MAINLY 42:23
MAJOR 12:25;58:18
MAKES 55:24,25
MAKING 16:8
MALE 16:11
MALFUNCTION 7:9
MALINGER 58:3;59:3
MALINGERER 57:17;
59:4
MALINGERERS 59:3
MALINGERING 56:23;
57:9,11,20;59:9
MAN 32:15,15;45:2;54:21;
57:14
MANAGE 52:2,10
MANAGED 37:17
MANAGEMENT 5:2,15,
22;6:2,7;45:9;51:21
MANAGES 38:1
MANIFESTATIONS
37:13
MANY 11:11;12:6,20,22;
14:10;21:1;29:25;35:8,11;
36:16;48:5
MAP 6:20
MARK 28:20
MARKED 4:23
MARKET 5:24
MASS 22:3
MASTER 16:1
MATHEMATICIAN 32:24
MATTER 14:9;22:13;
49:10;53:4;57:4
MAY 8:14;12:17;20:7,9;
24:4,4,16;25:1,12;27:16,
18;28:3;37:6;46:4;47:3;
55:14,16;56:25
MAYBE 11:13,14;12:4;
17:20;21:13;27:20;52:8
MCAULEY 4:11;7:9,24,

25;8:3;12:21;13:22;23:17;
24:19;26:13;29:11;30:21,
23;31:9;33:9,15;35:3,9;
38:4;39:18;42:8;47:3;
48:21;50:16,24;51:12;
55:15
MCAULEY'S 8:19;29:18;
33:5;54:17
MCCAULEY 52:13
MD 4:1
MEAN 5:14;7:20;10:13;
11:17;16:16;22:1,6;25:4;
46:10;47:15;48:10;57:14,
22,24;58:2
MEANT 55:18
MECHANICS 15:5;17:25
MECHANISM 16:12
MECHANISMS 15:23
MEDICAL 8:19,24;11:5,
23;20:4,7;21:21;31:14;
38:24;50:12;51:21
MEDICATION 53:20;54:1
MEDICATIONS 13:19;
19:16;52:10
MEDICINE 4:16;5:19,19
MEDICINES 53:6,8;61:2,
5,8
MEMORY 40:5;52:19;
53:13,18
MEN 6:23
MENOPAUSE 50:6
MENTATION 39:23
MENTION 31:23;33:15,
24;35:2;39:7;42:6,7;52:19
MENTIONED 18:3;33:8;
48:18;50:14
MET 12:21;31:2
MICRO 15:17
MICROPATHOLOGY
15:9
MICROSECOND 17:17
MIDDLE 41:21
MIGHT 26:25;27:1;32:19;
45:11;46:10;51:7
MILD 42:8,13
MILES 16:25
MILLION- 8:16
MILLION-DOLLAR 8:15
MIND 18:25;21:25
MINE 6:23
MINIMAL 46:24
MINIMUM 61:9
MINNIE 14:5,7,8
MINOR 9:15;27:21
MINUTES 12:22;40:6;
50:21,22
MISS 60:20
MISSING 27:1
MISSIVE 32:23
MODELS 60:1
MODERATE 52:9
MOMENT 39:12
MONKEYS 60:2,2

MONKEY'S 60:7
MONTH 11:9;10;23:16;
61:4,6,9,10,12
MONTHS 13:17;19:8,15;
27:20
MORE 8:2;13:1,16;17:16;
20:18;21:18;23:4;29:15;
32:16;37:5;50:22;54:15;
55:11,21;61:21
MOST 6:5,8,23;11:19;
12:12;32:22;33:1;37:4;
38:7;53:6
MOSTLY 10:9,10
MOTION 59:22
MOTOR 10:14,15;27:19
MOUTH 54:21
MOVE 8:8,13;18:25;
19:11,13;32:18
MOVEMENT 41:2;47:2
MRI 60:17
MUCH 6:3,25;8:1;17:2;
18:22;19:17;23:9,19;27:8;
30:2;34:19,24;51:18;56:12;
57:3
MULTITASK 45:5
MUSSLER 12:7;19:22;
20:10;23:4,10;25:5,14,17,
18,19,21,24;26:2,18;27:14,
23;28:19;30:7;39:25;51:6;
59:19;61:16,23
MUSSLER'S 30:12
MYSELF 24:11;36:4

**N**

NAME 4:8,13;6:16
NAMELY 22:24
NAMENDA 53:21,23;
61:10
N-A-M-E-N-D-A 53:23
NANCY 4:9
NATIONAL 6:10;10:6;
22:4;26:16
NATURE 21:17
NAUSEATED 33:9
NEAR 46:16
NEARLY 12:10;53:12
NECESSARILY 38:13;
39:9
NECK 31:17;39:23;47:2
NECKS 10:7,8
NEED 9:17;16:17,25;19:2;
21:16;27:4;30:16;31:7;
40:14,15,16
NEEDED 21:6,7,8
NERVES 16:12
NEUROENDOCRINE
6:22;7:22;36:14;37:20;
43:12;48:4
NEUROENDOCRINOLOGY
6:20
NEUROLOGIC 39:20;
40:13,17

NEUROLOGICAL 4:16; 5:1,12;39:22
NEUROLOGIST 37:9
NEUROLOGISTS 35:8
NEUROLOGY 11:16
NEUROPATHOLOGY 13:25
NEUROPSYCHOLOGICAL 40:15;43:9;50:14
NEUROPSYCHOLOGIST 53:4
NEUROSURGEON 6:5, 12;37:10;60:9
NEUROSURGEONS 5:20;6:5;35:9
NEUROSURGERY 11:17,18
NEUROSURGICAL 6:2
NEUROTRAUMA 7:21
NEW 27:8;28:3;45:21
NICE 36:1
NINE 10:3;27:20
NMDA 53:24
N-METHYL-D 53:23
NOIR 56:18
NONE 43:1;44:18
NON-FUNCTIONING 57:15
NORMAL 28:8;39:23; 40:17;41:7,22;42:3,5; 49:25;50:1,4,7
NORMALLY 40:4
NOTATION 39:2
NOTE 4:20;28:23
NOTICE 52:22
NOTICED 23:3;48:20
NOVEMBER 35:2
NOWHERE 46:16
NUMBER 15:21;16:6; 51:21

**O**

OBJECT 59:25
OBJECTIVE 57:25;58:3
OBTUSE 12:25
OBVIOUS 21:8;57:15
OBVIOUSLY 33:12
OCCASION 11:21;30:13; 51:23
OCCASIONALLY 35:3,5
OCCURRED 4:11
OFF 16:19;17:3,4;55:8
OFFER 50:2
OFFERED 31:22
OFFICE 12:16;51:20
OFFICE-BASED 5:12
OFF-THE-RECORD 55:13
OFTEN 11:7;19:5;59:20
OFTENTIMES 10:14; 24:6;32:12
OLDER 14:15

ONCE 11:9;10;37:22
ONE 6:11;7:5,6,10,11,17, 23;10:5;19:5,8,25;21:5,13; 27:22,23;30:6,14,15;32:19; 36:1,10,21;37:18;38:7; 45:23;46:4,4,4;48:18;49:6; 52:18;54:8,23;55:21;56:23, 24;61:21
ONLINE 6:16
ONLY 5:20;9:22;19:7,8; 20:11;32:25;35:20;44:8
OPEN 7:21
OPERANT 43:24
OPERATING 51:17
OPHTHALMOLOGIST 38:8
OPINION 8:3;27:11; 35:19;38:23;43:8;46:12; 47:7,8;48:1;51:12;58:11
OPINIONS 20:25;23:10; 27:5,6;35:22
OPPORTUNITIES 11:8
OPPORTUNITY 33:4
OPPOSED 8:15;32:19
OPT 50:8
ORDER 23:12;24:8,10,12; 61:9
ORDINARY 15:23;49:22
ORGAN 58:15
ORGANIZE 47:22
OUT 19:14,24;21:6,7; 24:21,24;25:6,19;26:6; 30:2;38:19,22;47:20,21; 49:18;51:8,23;56:15,19; 57:8
OVARIES 16:11
OVER 12:13;18:12;20:5; 57:3
OVERALL 11:6
OVERHEAD 47:1
OVERSIGHT 39:6
OWN 21:8

**P**

PAGE 39:25;40:1;41:20
PAID 30:20
PAIN 4:16;5:2,13,15,19, 19,22,24,25;6:2,7,7:3;9:13; 10:13;31:19,20;35:3,5; 36:6,7,8,19,23;37:3,13,16, 17,21,21;38:2;52:10
PARADIGM 9:5
PARAGRAPH 41:22
PARDON 25:25
PARENT 16:22
PARKINSON'S 5:11
PART 17:10;19:3,4;39:6; 52:7
PARTICULAR 5:22; 21:17;22:24;28:12;49:5; 51:14;52:5;56:17
PARTICULARLY 49:7;

51:16
PASSED 8:20;12:16
PAST 29:5;43:16,23; 44:17
PATIENT 7:17;31:11; 44:14
PATIENTS 6:25;8:11; 9:12;39:10,16;51:19
PAYING 30:21,24;57:5
PEAR 50:4
PEAR-SHAPED 49:13, 16
PEOPLE 7:2,3,6;8:16; 9:17,19;10:10,10;12:16,18; 18:5;19:11,12;21:2,14; 22:10,14,16,25;24:6;29:12; 30:19;32:10,16,21,22,24; 35:20;36:13,20;37:5;39:9; 42:12,17;49:10;50:8;51:18, 22;52:2,3,8;53:6,24;56:3; 57:12,17;58:13;59:2
PEOPLE'S 45:6
PEPTIDES 6:21
PERCENT 6:4;9:11,21; 10:1,23;11:6;12:4;41:16; 45:16;46:1,4,7,9
PERCENTAGE 10:15,18, 25;37:25
PERFECT 41:5
PERFORMED 20:6;40:5
PERFORMING 40:8
PERIOD 43:19,22
PERIODS 52:2
PERIPHERY 30:3
PERMANENT 9:16; 46:23;47:14;51:13
PERSON 6:20;8:7;14:5; 43:12;45:16;48:23;55:12; 57:5
PERSONAL 9:17;43:8
PERSONALLY 21:21
PERSPECTIVE 6:3;7:1, 2;21:22;25:12;36:6
PHONE 18:23,23;22:9; 29:20
PHYSICAL 8:2;9:13;24:1; 39:20;54:16
PHYSICIAN 4:17;11:21; 19:5;43:21
PHYSICIAN/PATIENT 18:7
PHYSICIANS 29:18
PHYSIOLOGY 6:18,19
PI 32:25
PIANIST 46:6
PIANO 46:6
PICK 7:18;18:22,23; 32:17;40:14;56:9
PICKED 19:9
PICTURE 14:8
PIECE 47:23;56:18
PILL 53:8,15
PITUITARY 6:18,19;7:5,

9;9:5,6;16:1,3,15;22:4; 23:1;38:19,21,25;48:5,19, 24,25
PLACE 24:22
PLACES 22:3;53:11
PLANTAR 41:22,23
PLASTICINE 60:7
PLATE 19:13
PLAY 46:6
PLAYED 19:24
PLEASE 4:12
PM 62:3
POINT 8:2,5;16:2;43:10; 45:10;48:2;53:16
POINTS 32:25
POLITICAL 22:22
POOR 16:23
POSITIONS 47:5
POSSESSION 30:6
POST-ACCIDENT 44:12
POST-CONCUSSIVE 33:25;34:8
POTATO 22:24
POUNDS 46:25;50:3
PRACTICAL 7:2;8:10
PRACTICE 6:7;9:8;11:1, 3,6;36:16;37:25;52:9
PRECISE 24:9
PRECISION 61:1
PREDICT 56:6
PRE-MARKET 22:11
PREPARE 28:7
PREPARED 23:15;51:5
PRESCRIBE 53:20
PRESCRIBED 19:16; 60:23
PRESCRIPTION 24:1; 61:1
PRESCRIPTIONS 23:24, 25
PRESENT 44:1,6,8,18; 52:24
PRESENTATION 14:2
PRESSURED 40:2
PRETTY 6:24;19:17;21:8; 30:2;47:9;49:1;53:13; 56:12
PREVIOUS 8:19
PRIMARILY 30:14
PRIMARY 10:16;19:23; 57:6,6
PRIOR 5:17;6:8;8:24; 27:9,14;44:15;46:14
PRIVATE 25:9,20;30:12
PRIVILEGE 25:16
PRIVILEGED 25:10
PROBABILITY 38:24
PROBABLY 5:23;6:4,6; 7:7,10;8:22;10:1,17,22; 11:9,21;12:4,11;13:18; 15:10;16:1;17:6,6,19;24; 22:19;29:13;31:2,2;33:1; 34:18;35:1;37:4;39:3;

45:10,21,23;47:10,13;51:9; 52:8,21;61:8
PROBLEM 13:3;16:18; 33:1;39:12;48:19;56:11
PROBLEMATIC 19:10; 57:10
PROBLEMS 7:4;8:24; 13:13;19:1,9;20:15,17; 27:2;29:16;37:6;38:5;39:3, 4;41:17;43:21;44:16
PROCEEDING 27:13
PROCESS 16:14;21:18; 22:18;42:10;56:1,2;58:21; 60:14
PRODUCED 16:2;60:4
PRODUCES 15:17;17:15
PRODUCT 25:2,3,4
PRODUCTIVE 22:25
PROFESSION 46:14
PROFESSIONAL 29:13
PROGRAM 8:14;10:4
PROGRESS 55:9
PROGRESSED 8:25
PROGRESSIVE 54:25
PROPOSE 48:12
PROS 26:16
PROVIDE 18:22;28:19; 45:15;51:10;52:12,16
PSYCHOLOGICAL 44:16
PUBLIC 22:13
PUBLISHED 6:9,13,18, 19
PUNCH 7:14
PUSH 36:13
PUT 11:5;29:25;32:2; 45:23;49:12;51:6;52:3; 54:19;56:21;59:3;61:14,14
PUTTING 54:20

**Q**

QUADRANT 10:7
QUIBBLE 58:13
QUICK 32:17
QUICKLY 5:17;55:11; 60:8
QUIT 60:13
QUITE 34:20;38:18;50:22

**R**

RANGE 59:21
RAPIDLY 60:4
RARE 11:23
RATE 14:15,16,17,21,22, 22;15:1,2
RATINGS 45:15
REACH 31:25
REACHES 49:23
READ 33:19
READY 53:14
REAL 36:15;37:14,19;

38:17;57:2;59:12
**REALIZED** 53:16
**REALLY** 6:3;17:23,24,25;
18:16;35:20;37:16,23;
38:15;39:15;57:18;59:4
**REAR** 17:5
**REAR-END** 59:20
**REASON** 7:5;28:16
**REASONABLE** 38:24
**REASONABLY** 44:25
**REASONS** 9:17;22:22;
36:10;50:9,10
**RECALL** 19:23;23:12,18;
24:9;38:15;41:19;43:17;
50:17,23
**RECEIVED** 4:22;28:17
**RECENT** 40:3
**RECESS** 4:20
**RECITE** 32:25
**RECOGNIZE** 58:12
**RECOGNIZED** 21:13
**RECOGNIZES** 14:3
**RECOLLECT** 42:23;43:1
**RECOMMEND** 36:17
**RECORD** 4:13;22:13;
24:1;27:12;39:5;43:7;44:4,
7
**RECORDS** 7:25;8:1,20;
9:1;20:1;23:19,20;24:2;
26:6;30:6,7,10,12;31:15;
35:18;39:2
**REDUCE** 9:12
**REFER** 9:18
**REFERRED** 7:17
**REGARD** 55:24
**REGARDING** 4:11
**REGISTER** 45:12,13
**REGRESSIVE** 21:1
**REGULAR** 29:2
**REGULATION** 58:17
**REHAB** 51:23,25,25
**REHABILITATION** 5:14
**RELATED** 23:7;24:25;
26:14,15;36:15;44:1
**RELATES** 6:24
**RELATIONSHIP** 12:24;
18:4,7,8,11;27:11;36:23;
46:3;58:11
**RELATIONSHIPS** 29:13
**RELATIVELY** 11:23;52:1
**RELEASED** 22:8
**RELEVANT** 44:24
**RELY** 26:12
**REMEMBER** 40:7,13;
47:22;51:6;54:5
**REMEMBERING** 40:6
**REMOVE** 25:20
**REPAIRING** 15:23
**REPETITIVE** 47:2
**REPORT** 20:8;23:14;
27:19;31:8,11,12;32:2;
33:8,15,19;39:19;40:1;
42:7;44:8,14,21;45:14;

50:15;52:23,24
**REPORTED** 40:23;41:10
**REPORTER'S** 4:20;
28:23
**REPORTING** 32:6
**REPORTS** 35:2
**REPRESENTED** 12:15
**REPRESENTING** 4:9
**REQUEST** 51:9
**REQUIRE** 47:3
**RESEARCH** 6:13
**RESPECT** 14:12;18:21;
20:15,15;27:9;30:4;39:17;
48:4;51:11
**RESPOND** 53:1
**RESPONSE** 51:9
**RESPONSES** 40:9,10;
41:23,24
**RESPONSIBLE** 58:16
**REST** 16:9
**RESTRICTIONS** 46:23;
47:14
**RESTRICTIVE** 21:1
**RESULTS** 28:18
**RETAINED** 28:24
**REVIEW** 8:20;9:1
**REVIEWED** 26:5
**RIGHT** 5:23;10:9;13:4;
14:20;16:15;19:22;23:9;
25:9;22;28:10;32:8;33:23;
34:16;35:16;42:4;46:21;
50:20;54:10,12;55:9,23;
56:8;57:23;58:1;59:12,22
**RIGOROUS** 21:19
**RIPPED** 16:13;58:20
**RIPPING** 16:2
**RIPS** 15:17
**RISK** 21:19
**ROOF** 12:11
**ROOM** 10:3
**ROUTINE** 22:6
**RULE** 56:15
**RUN** 45:12,13
**RUNS** 61:6,10

**S**

**SALE** 47:21
**SALESMAN** 46:20
**SALVES** 61:14
**SAME** 21:12;22:17;35:5,
19;36:16,17;41:14;43:12;
49:4
**SAW** 10:8;18:15;38:4;
54:9
**SAYING** 13:22;53:5;55:22
**SCANS** 33:5
**SCREENING** 24:7;42:12
**SCRIBBLED** 7:15
**SCRIPS** 19:3,6,7
**SEAT** 31:16
**SEAT-BELTED** 31:9
**SECOND** 4:19;60:18

**SECONDARY** 40:16;
56:15,17,19,24,25;57:6,7,
10
**SECTION** 39:20
**SECURITY** 8:17
**SEDENTARY** 47:6
**SEEING** 50:18
**SEEM** 9:19;23:12
**SEEMS** 17:11
**SELF-LIMITING** 27:21;
43:22
**SELLA** 16:4
**SEND** 7:25;8:11;24:3,6
**SENSE** 15:3;27:18;32:13;
36:21;50:1
**SENT** 7:24;19:22;24:4
**SEPARATE** 30:25
**SEPARATELY** 21:12
**SEPTEMBER** 4:12
**SEQUELAE** 31:20
**SERIAL** 40:4
**SERIES** 42:11
**SET** 6:20;7:21;14:17;
19:12;37:2
**SETTING** 40:18
**SEVENS** 40:4
**SEVERE** 52:9
**SHAKE** 16:23
**SHAKEN** 16:14,17,20,21;
34:11
**SHAKES** 15:15,16
**SHALL** 19:2
**SHARE** 5:24
**SHARP** 59:4,6
**SHELF** 30:10
**SHIFTED** 18:11
**SHIPPING** 16:8
**SHOE** 56:7
**SHORT** 53:4;60:19
**SHORT-TERM** 40:5;
52:19;53:13,18
**SHOW** 7:4;58:8;60:16,18
**SHOWED** 39:23
**SIDE** 7:22;38:1
**SIGNIFICANT** 15:21;
51:22
**SIX** 40:1
**SIXTH** 60:18
**SIZE** 58:15
**SKILL** 7:21;19:12;37:2
**SKULL** 15:17
**SLEEPING** 42:13,16,18;
44:5
**SLIPPED** 10:21
**SMALL** 10:25
**SMELL** 41:13,14,15,16
**SMILE** 32:18
**SOCIAL** 52:13
**SOCIETIES** 22:21
**SOCIOECONOMIC**
22:23
**SOLID** 59:25
**SOLVE** 13:3

**SOMEBODY** 7:13,14,19;
10:21,21;18:1;31:21;32:5;
36:4,9;47:19,22;48:25;
49:24;57:19
**SOMEBODY'S** 37:15,20
**SOMETIME** 43:23
**SOMETIMES** 18:6,7,8;
24:10,12
**SOMEWHERE** 7:14;
11:9;20:8;61:8
**SOON** 33:3
**SORRY** 29:4;53:22
**SORT** 5:11;6:25;7:6;14:6;
16:5;32:22;35:11;53:15;
56:19;57:7
**SOULS** 32:12
**SOUTH** 10:5
**SOUTHEAST** 10:7
**SPECIALIST** 5:2,13
**SPECIALIZED** 38:8
**SPECIALTIES** 5:5
**SPECIALTY** 6:23;36:21
**SPECIFIC** 21:14,19,24,
16;42:21,25;55:15,20
**SPECIFICALLY** 29:14,
18;38:13,16
**SPEND** 10:24;22:14;
26:18;38:9
**SPINAL** 10:6
**SPOKE** 43:14
**SPOKEN** 29:9
**SQUATTING** 47:1
**STANDARD** 21:10;22:7,
20
**STANDARDS** 6:14
**STANDING** 33:12
**START** 12:8;52:20;55:8
**STARTED** 13:15;53:17
**STATE** 4:12;13:15;31:9
**STAY** 9:16;48:13
**STEP** 19:13
**STILL** 6:6;47:7
**STIMULATION** 22:7
**STOMACH** 49:7
**STOOL** 16:20;17:3,4
**STOOPING** 47:1
**STOP** 16:23
**STOVE** 53:11
**STRAIGHT** 17:16
**STREET** 14:5
**STRESS** 45:6,12;47:17;
55:24
**STRETCH** 47:4
**STRETCHED** 16:2
**STRICT** 21:3
**STRICTLY** 11:22;25:19;
26:14
**STRIKING** 59:25
**STRONG** 43:11
**STRUCTURE** 49:1
**STUDIED** 15:8;17:13
**STUDIES** 22:16,17
**STUFF** 21:16;26:9;36:18;

45:19,24
**STYLE** 22:18;36:17
**SUBJECTIVE** 41:6,10
**SUBSPECIALTY** 5:15
**SUBTLE** 32:16
**SUCCESSFUL** 47:7,25
**SUDDEN** 17:9;56:8
**SUFFICIENT** 21:24;22:1
**SUGGESTED** 31:15
**SUGGESTIVE** 58:9
**SUMMARY** 51:10
**SUPPORT** 18:22
**SUPPOSED** 20:5
**SURE** 7:11;10:20;24:17;
25:2,13;26:23;35:15;38:21;
43:7;46:15;56:2
**SURGEON** 4:16;5:1
**SURGERIES** 10:2
**SURGERY** 5:7,12;9:9,18
**SURGICAL** 9:18
**SURPRISED** 38:18
**SUSPECTED** 7:10
**SUSPICION** 43:11
**SWALLOWING** 41:7
**SYMPTOMATIC** 21:15
**SYMPTOMS** 27:12;
29:19;43:25;44:2,4,8,11,
19;54:23,24
**SYNDROME** 16:4,21;
33:25;34:8
**SYNDROMES** 36:19
**SYSTEM** 16:7;36:7,14,23;
37:3,20,23;43:13

**T**

**TABS** 35:12
**TALK** 7:23;18:23,24;
22:10;26:4,21;28:1;29:14;
36:12;39:13;44:15;48:5
**TALKING** 26:18;44:2;
53:5;54:2,13,14;55:17;
58:13,18;61:7
**TALLIED** 12:9
**TASK** 48:14
**TASKS** 55:15
**TASTE** 41:6,9,15,16
**TASTES** 41:11
**TEAM** 19:4,4
**TEARS** 15:18
**TEASE** 32:24
**TECHNICALLY** 13:23;
34:20
**TECHNIQUES** 43:11
**TELLING** 54:4
**TEMPLE** 17:20
**TEN** 10:23;27:20;58:18
**TEND** 9:16;13:19,10
**TEN-THOUSAND-** 8:15
**TERM** 14:14;15:10,12
**TERMS** 11:2;14:3;39:23
**TEST** 21:19;22:19;24:7;
57:25;58:3,5

Declan J. McAuley v.
R & L Transfer, Inc.

David G. Changaris, M. D.
July 25, 2006

TESTED 40:21
TESTICLES 16:10
TESTIFIED 4:3;11:15,20,
22
TESTIFY 11:7,25
TESTING 8:12;21:11;
22:5;28:18;40:15,16,16;
43:9
TESTOSTERONE 50:6;
58:7,16;61:11
TESTS 8:8,9;21:23;22:7,
15,16,17;24:3,5,8,10,13;
31:24;36:16,18;37:7;40:7;
41:21;57:22,24
THERAPIES 9:13
THERAPIST 50:18
THINKING 14:13;52:10;
53:17
THOUGH 13:12;36:2;
52:23
THOUGHT 7:14;20:25;
40:10
THOUGHTS 39:24
THREE 10:8;11:13,22;
30:10;31:3;37:22;40:6;
53:10;61:12
THUMB 30:11
THYROID 36:18;58:7,17
TICKLE 41:25
TIGHT 20:21
TIMES 11:11,13,22;12:6,
12,20,22;13:18;29:25;31:3;
37:23
TIMING 24:9,9
TISSUE 58:20
TODAY 6:1,5;28:1,8,21;
39:12;48:2
TODAY'S 28:7,14
TOES 42:1
TOGETHER 11:5;16:5;
29:25;45:23;47:23,24;51:7;
59:3
TOLD 9:4;27:23;33:10,22;
35:4;43:3;50:18
TOM 60:11
TOOK 60:12
TOOL 42:12
TOP 58:20
TORN 15:22
TORSION 15:16
TOTAL 10:24,25;11:3;
23:13;51:11
TOTALLY 26:9;46:10,13;
51:13
TOUCHY 56:3
TOUGH 13:23
TOWARDS 41:20
TRACK 12:9;35:15
TRACKING 22:14
TRAINING 10:4;13:24;
37:10;51:14,15,16;52:5
TRANSFER 4:10
TRAUMA 6:8,17,24;7:22;

9:25;14:25;16:20;21:15;
31:20;36:20;37:12,13;38:7;
54:25;58:12,19
TRAUMATIC 9:6;14:11;
36:22;45:16;51:22;54:25;
55:5
TRAUMATIC-ASSOCIATED
13:14
TRAVELING 44:23
TREAT 8:6;10:13;13:19;
20:5;23:23;29:15
TREATED 12:18
TREATER 12:25
TREATING 9:11;11:20;
13:13,15,19;19:5;21:3;
53:25
TREATMENT 6:15;8:13,
17,20;9:9;18:17;20:6;
29:19;30:4,16;31:20;38:2;
52:1
TREATMENTS 19:18;
26:25
TREATS 36:8;37:5,15
TRIAL 11:12,13;61:21
TRIED 22:9
TROUBLE 32:14;39:10;
42:15,18,20;54:6
TRUE 21:14;32:1
TRY 7:3;13:3,8;19:12,13;
52:16
TRYING 11:19;30:25
TURNED 17:14;37:14
TURNING 17:13
TWICE 11:10
TWISTING 47:1
TWO 8:5;11:21;13:17;
17:17;21:11;27:22;28:21;
47:4
TWO-SYLLABLE 32:20
TYPE 6:16
TYPICAL 50:25;51:2

## U

UNABLE 55:16
UNDER 6:6;42:7
UNDERSTANDS 36:12,
24;37:4,6,8
UNIVERSITY 10:1,5
UNNECESSARY 21:21
UNPROTECTED 46:25
UNUSUAL 48:23
UP 7:4;10:23;12:9;13:13;
16:17;18:22,23;19:9,13,15;
25:17;28:6;32:17;40:14;
42:13;44:10;45:20;46:1;
52:20;56:9;58:10;60:9,16,
18
UPON 8:8;32:6;39:11;
45:21,25;61:12
UPSET 47:20
UP-TO-DATE 27:15
USE 10:16;22:15;32:4;

42:11;53:24
USED 13:19;22:18;52:15
USUAL 55:5
USUALLY 7:5;33:19;61:6
UTILITY 43:5

## V

VACATIONS 44:23
VAGUE 49:18
VARIETY 39:21
VARIOUS 9:24;49:21
VEHICLE 10:14,15;27:19
VELOCITY 16:25
VESSELS 15:19,25;16:13
VIEW 6:25
VISION 38:5,6,20;39:3,4,
8;40:24;41:3
VISIT 20:1;27:22;28:7,8
VISUAL 38:16,17;40:22
VOCATIONAL 51:14,15

## W

WALK 9:23
WALLET 53:11
WALNUT 58:15
WAND 56:19
WANTS 24:7;28:13
WARRANTS 45:23
WATCHING 33:13
WATER 21:22;54:20
WAY 6:21;14:18,19;19:10,
24;32:8;36:8;53:3;58:2
WAZOO 58:10
WEATHER 56:4
WEEK 10:8;60:19
WEIGHT 36:20;48:20,24,
25;49:2,3,6,11,12
WEREN'T 33:12
WHACKING 34:14
WHAT'S 13:4;14:8;15:20;
51:10
WHEREAS 8:13;32:22;
33:1
WHEREUPON 4:20,22
WHOLE 8:7;10:7;45:16
WHO'S 50:3
WIFE 53:13
WILLING 18:9
WINTERS 20:21;21:9
WIRES 15:18,20
WISH 12:8
WITHIN 16:8;38:24
WITHOUT 52:3;59:25
WITNESS 28:24;62:2
WOMAN 16:11;49:13,22;
50:3
WOMEN 49:15,19
WONDERING 38:12
WONKING 17:10,11
WORD 32:19,20,20,21;
52:18

WORDS 27:5;32:19;
36:22;38:14;40:2;47:16;
54:20;56:24
WORDS/OBJECTS 40:6
WORK 6:8,12;9:10;11:4;
16:15;25:1,3,4;28:13;
42:23,24;43:6;46:15;47:1,
6,24;51:18
WORKED 7:19;12:6
WORKING 13:3;23:1;
59:8
WORKUP 8:15,16,17;
13:11
WORLD 5:17;6:14;37:19
WORSE 44:20;55:2,10,10
WORTH 21:3
WRITE 23:23
WRITING 19:3,6
WRITTEN 19:7;43:2;
52:12
WRONG 53:6
WROTE 39:19;45:18

## X

X-RAY 60:17
X-RAYS 33:5

## Y

YEAR 6:11;11:13;23:17;
43:23;45:18
YEARS 5:21;22:20;53:10
YELL 56:4
YOU-ALL 26:21

## Z

ZIP 51:23

1    STATE OF KENTUCKY      )

2                           )ss

3    COUNTY OF JEFFERSON )

4         I, **ERIC J. SOERGEL**, A NOTARY PUBLIC, WITHIN

5    AND FOR THE STATE AT LARGE, DO HEREBY CERTIFY THAT THE

6    FOREGOING DEPOSITION OF

7              **DAVID G. CHANGARIS, M.D.**

8    WAS TAKEN BEFORE ME AT THE TIME AND PLACE AND FOR THE

9    PURPOSE IN THE CAPTION STATED; THAT THE WITNESS WAS

10   FIRST DULY SWORN TO TELL THE TRUTH AND NOTHING BUT THE

11   TRUTH; THAT THE DEPOSITION WAS REDUCED TO SHORTHAND

12   WRITING BY ME IN THE PRESENCE OF THE WITNESS; THAT THE

13   FOREGOING IS A FULL, TRUE AND CORRECT TRANSCRIPT OF THE

14   SAID DEPOSITION SO GIVEN; THAT THERE WAS NO REQUEST

15   THAT THE WITNESS READ AND SIGN THE DEPOSITION; THAT THE

16   APPEARANCES WERE AS STATED IN THE CAPTION.

17        I FURTHER CERTIFY THAT I AM NEITHER OF COUNSEL

18   NOR OF KIN TO ANY OR ALL OF THE PARTIES TO THIS ACTION,

19   AND AM IN NO WISE INTERESTED IN THE OUTCOME OF SAID

20   ACTION.

21        WITNESS MY SIGNATURE THIS 29TH DAY OF JULY, 2006.

22

23   _____
     NOTARY PUBLIC
24   STATE AT LARGE, KENTUCKY

25   MY COMMISSION EXPIRES:  OCTOBER 29, 2007

```
 1    STATE OF _____)

 2    COUNTY OF _____)

 3         I, DAVID G. CHANGARIS, M.D., DO HEREBY CERTIFY
      THAT I HAVE READ THE FOREGOING DEPOSITION CONSISTING OF
 4    THE FOREGOING PAGES, AND THAT THE ANSWERS AND
      INFORMATION CONTAINED THEREIN ARE TRUE AND CORRECT TO
 5    THE BEST OF MY KNOWLEDGE AND BELIEF WITH THE EXCEPTION
      OF THE FOLLOWING CORRECTIONS AND CHANGES LISTED BELOW
 6    OR IN AN ADDENDUM ANNEXED HERETO, IF ANY:

 7    PAGE NO. LINE NO. CORRECTION

 8

 9

10

11

12

13

14

15

16

17

18
                          _____
19                        DAVID G. CHANGARIS, M.D.

20    STATE OF _____)
      COUNTY OF _____)
21
                          SIGNED AND SWORN TO BEFORE ME THIS
22    _____ DAY OF _____, _____.

23                        MY COMMISSION EXPIRES:

24
                          _____
25                        NOTARY PUBLIC
                          STATE OF
```

64